UNITED STATES of America, Appellee,

v.

Jackie David MILLER, Defendant, Appellant.

No. 78–1093.

United States Court of Appeals, First Circuit.

Argued Sept. 7, 1978.

Decided Nov. 15, 1978.

U.S.C. §§ 841(a)(1), 952(a), 960(a)(1); 18 U.S.C. § 2. The jury also convicted him of possession of 2 grams of hashish. 21 U.S.C. § 844(a). The district judge sentenced appellant to the maximum term in prison for each of the three offenses, 5 years for each of the first two offenses and one year for the third, the sentences to run concurrently. Appellant now challenges some aspect of virtually every stage of official interference with his enterprise: the searches of his boat, car, and land; the use at trial of his admissions of guilt; the admission of evidence of the size of his enterprise; the sufficiency of the evidence supporting his conviction for importation; the charge to the jury explaining reasonable doubt; and the considerations supporting the trial court's imposition of maximum sentences. The relevant facts add up to a substantial narrative. Each cluster of facts provides one or more occasions for an exercise of judgment by one or more of several law enforcement agencies. All such decisions are attacked on appeal. Some issues were not preserved; some are close questions. We conclude our necessarily lengthy analysis by affirming.

Martin G. Weinberg, with whom Joseph S. Oteri, Judith F. Bowman, New York City, Oteri & Weinberg, Boston, Mass., Jeanne Baker, David J. Fine, and Rosenberg, Baker & Fine, Cambridge, Mass., were on brief, for defendant, appellant.

George J. Mitchell, U. S. Atty., Portland, Me., with whom Paula D. Silsby, Asst. U. S. Atty., Portland, Me., was on brief, for appellee.

Before COFFIN, Chief Judge, KUNZIG,[*] Judge, U. S. Court of Claims, DUMBAULD,[**] Senior District Judge.

COFFIN, Chief Judge.

A jury found appellant guilty of importing and possessing with intent to distribute more than 3000 pounds of marijuana 21

### The Facts

We set forth in this preliminary statement the events necessary to put each of appellant's arguments in context. Elaboration essential for the disposition of particular issues appears subsequently.

On Friday, May 13, 1977, at approximately 5:45 a. m., an employee of the Robinhood Marina in Arrowsic, Maine, noticed a yacht, the COLD DUCK, fouled in one of the marina's moorings about 250 yards offshore. The boat had never been seen in Arrowsic before and no one had arranged to rent the mooring. By mid-afternoon employees of the marina decided to investigate. One employee rowed out and boarded the boat. He found no one on board, the rubber dinghy, used to ferry mariners ashore, still in the cockpit, and a partially eaten meal on the stove. Meanwhile, another employee called

---

* Sitting by designation.

** Of the Western District of Pennsylvania, sitting by designation.

the boat's home port and learned that the boat had recently been sold to one Jackie Miller. After conferring, the employees called the Coast Guard to report a suspected drowning.

The Coast Guard visited the marina and notified the Sagadahoc County Sheriff's Office. By 8:00 p. m. the Coast Guard, Maine State Police, Sheriff's Office, Maine State Department of Sea and Shore Fisheries and the owner of the marina had all arrived to investigate. At approximately 10:30 p. m. Chief Deputy Sheriff Charles Brawn and Coast Guard officers boarded the COLD DUCK. They found a bill of sale and registration made out to Jackie D. Miller, P.O. Box 42, Woolwich, Maine. They left the boat. The Coast Guard then called the former owner of the boat and learned that Miller had paid $19,500 cash in small bills for the boat and had asked for a receipt showing a price of $15,000.

The Sheriff's Office assumed responsibility for hiring divers to search the area for bodies at first light, and all officials left the area around midnight. Deputy Frederick White was assigned to make an hourly visual check on the boat during the night. Shortly after midnight, Deputy Brawn tried to telephone Drug Enforcement Agency (DEA) Special Agent Edward Drinan, who heads DEA operations in Maine. Brawn suspected the COLD DUCK might be involved in drug smuggling operations being investigated in Lincoln County. Independent of Deputy Brawn, a Coast Guard warrant officer who had attended "drug awareness" seminars conducted by Drinan succeeded in reaching the agent and informed him about the COLD DUCK.

At 9:00 a. m. Deputy White and Deputy Gordon Kinney met at the marina. Divers were already searching the waters around the boat. Kinney and White boarded the COLD DUCK to help the Coast Guard in clearing the boat from its fouled mooring lines and towing it to a marina slip. While aboard, the deputies noticed several thousand dollars worth of new electronic navigational equipment which had been install-ed in a sloppy, unprofessional manner. They also noticed a number of roaches (partially burned marijuana cigarettes) in ashtrays on the deck and the flying bridge. Perusing the main cabin for more information about where the owner might have gone, Kinney noticed a navigational chart lying on the floor, folded so that the printed part of the chart was exposed. He spread the chart on the table and observed a penciled course threading its way from the marina to a ledge located off of Mill Isle, a secluded peninsula located in Arrowsic near the confluence of the Sasanoa and Back rivers. White and Kinney did not engaged in a general search of the boat.

When the boat was secured to the dock, Deputy Brawn boarded it to discuss the situation with White and Kinney. They showed him the chart and the three discussed the possibility that the boat was involved in drug smuggling in the area. At about the same time, appellant drove into the marina parking lot in a late model, black Chevrolet Blazer. Appellant approached Willard Muise, a marina employee working in the lot, identified himself, and stated that he wished to lease a mooring for his boat. When Muise asked what type of boat Miller owned, appellant pointed to the COLD DUCK and noticed law enforcement officers on her. Appellant inquired about their presence and Muise explained that the men had brought the boat to the dock in order to free the mooring. Muise then suggested that appellant check with the main office about renting a mooring and left the lot.

A few minutes later Muise went down to the COLD DUCK and asked if appellant had been there. He had not. Muise provided a description of appellant and his vehicle, and witnesses in the lot reported that he had recently departed, apparently in a hurry. The three deputies set out in two cars to locate appellant. Deputy White proceeded alone to Georgetown Center where he passed appellant going in the opposite direction. The two had eye contact and ap-

pellant accelerated rapidly.[1] White immediately turned and gave chase, at speeds in excess of 90 miles per hour. White caught up with appellant in about two miles and, with lights and siren operating, tailed appellant for another two miles before appellant stopped his vehicle. Appellant produced his license and registration upon request and admitted that he owned the COLD DUCK. White then escorted appellant back to the marina, driving his police car behind the Blazer.

At the marina parking lot, Brawn began to question appellant, and, after appellant again admitted owning the COLD DUCK, Brawn read him his *Miranda* rights. Appellant agreed to speak without a lawyer. Appellant then stated that his ownership papers were on the boat and voluntarily accompanied Brawn and Sheriff Tainter in boarding her. Agent Drinan arrived a few minutes later and, after being briefed by Brawn, boarded the COLD DUCK. Drinan identified himself to appellant and explained that he suspected appellant had been engaged in drug smuggling. He observed two roaches in an ashtray on the boat and proceeded to discuss the situation with the appellant.

Meanwhile, back in the parking lot, Deputies White, Kinney, and Setlar were standing around "admiring" appellant's Blazer through the door that appellant had left open. They noticed marijuana debris on the floor of the vehicle, field tested the substance, locked the vehicle, and apprised Drinan of their discovery. Drinan informed appellant that his suspicions were growing, and appellant was again informed of his *Miranda* rights. Appellant remained relaxed and casual, moving freely about the boat preparing a meal, answering general questions and refusing to answer when he so willed. Drinan suggested that appellant cooperate and explained maximum sentences for the crimes appellant might have committed. Appellant remained calm and denied any involvement with smuggling. Drinan then seized the COLD DUCK.

The parties then returned to the locked Blazer in the lot. Although appellant claimed he did not know who owned the vehicle, he unlocked it with his keys. Drinan removed four suitcases from the vehicle. When Drinan asked about the luggage, appellant disclaimed any ownership or knowledge of the suitcases. Drinan then searched the luggage, without any objection from appellant. The fourth piece was locked with a combination lock. Although appellant denied ownership of the suitcase, he stated that he knew the combination and unlocked it. In the case was a cube that a field test proved to be two grams of hashish. Drinan placed appellant under arrest for possession and seized the drug and the Blazer.

Deputy Setlar then frisked the appellant and found a sales receipt for an industrial vacuum cleaner, sold on May 13 (the day before) to a John Davis. Appellant later admitted he had signed the receipt using the false name. The Blazer was then thoroughly searched and a key, which later proved to fit the lock of the main house at Mill Isle, was found. Officers then went over a *Miranda* rights form with appellant, who stated that he understood his rights but would not sign the form. Appellant was then transported to a holding cell at the Sagadahoc County Sheriff's Office in Bath.

Drinan, Brawn, and Setlar then drove to Woolwich and, having obtained the street address that corresponded with the appellant's post office box, found an empty house and neighbors who reported that "Jackie" had moved out several weeks before. Brawn then suggested that, based upon the course marked on the chart, appellant might be connected with Mill Isle. The officers decided to go to Mill Isle[2] to ques-

---

1. As further detail may be relevant, we note that although the Deputy's vehicle was unmarked, it did possess a flashing light, Deputy White was in uniform, and appellant, sitting high in the Blazer, could look down and into the Deputy's car.

2. Mill Isle is a peninsula of land connected to the mainland by a causeway. The parcel con-

tion the occupants of the houses there to see if they had observed any unusual activity at the deep water dock located there.

Upon arriving at Mill Isle the officers drove toward the chalet to question the occupants. They parked between the chalet and the dock. A telescope protruding from a trash barrel on the dock immediately attracted their attention. As they walked toward and onto the dock they observed substantial amounts of marijuana debris spread over the boards of the dock and in the cracks between the boards. The debris later tested as marijuana. Fresh tire tracks in the road from the dock bore distinctive markings similar to the criss-cross tread of the oversized tires on the Blazer. At the chalet the curtains were drawn and no one responded to the officers' knocks. As they prepared to go to the main house, Brawn suggested that they take a shortcut on a woods road leading from the chalet to the main house. On this road before they reached the main house the officers spotted a large tarpaulin, which covered a bulky object located on the side of the road. Scattered around it were baggie twists, of the sort used to tie large trash bags, and marijuana debris. The trail was beaten down and bore tire marks matching those near the dock. Drinan lifted the tarpaulin and found a forty pound bale of marijuana. Drinan seized the bale.

The officers then returned to Bath. Drinan again questioned appellant, telling him that the "stakes had gone up". Appellant declined to cooperate. Drinan then obtained and, with the help of local officers, executed a warrant to search the buildings on Mill Isle. In the chalet the officers found 60 bales of marijuana, a set of warehouse rollers and stands, and a new industrial vacuum cleaner matching the one bought by appellant the day before.

Drinan telephoned appellant from Mill Isle, explaining what had been found, and again asked appellant's cooperation. Appellant declined. After completing the search, Drinan returned to Bath to transport appellant to Portland for arraignment. On the way, the two stopped and had a light meal. Shortly after they left the diner, appellant spontaneously asked Drinan where he had found the first bale. Drinan refused to answer, but remarked that defendant had made a big mistake in jeopardizing a million dollar deal by returning for a $20,000 boat. Drinan next said that he did not think that law enforcement personnel had recovered all of the marijuana. Defendant replied, "Exactly. But you got a good piece of it, enough to destroy our profit." There was a pause, and defendant then stated, "Funny thing was, this was our first run." Drinan expressed disbelief at this statement and inquired as to the source of the marijuana. Defendant said it was of good quality from Colombia.

Subsequent investigation revealed that appellant had leased the Mill Isle property for $26,000, signing the lease on behalf of a fictitious organization named Carlisle Estate Ventures Ltd. Appellant, again in the name of Carlisle, had paid $15,000 to exercise an option to purchase the property for $260,000. Within two weeks prior to his arrest appellant had purchased a 48 foot ocean-going vessel named the HARVARD for $17,400. A bill of sale for the HARVARD was found in the main house at Mill Isle. Appellant was a 25 year old unemployed high school graduate with no ascertainable capital resources.

*Search and Seizure Issues*

■ We begin our discussion of Fourth Amendment issues with the fundamental premise that warrantless intrusions violating reasonable expectations of personal security and privacy are *per se* unreasonable. *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Several of the searches involved in this case raise questions about the definition of "reasonable expectations of privacy". Others are defended as being within the few exceptions

---

tains a dock, a chalet cottage near the dock, a main house one-quarter mile from the chalet, a barn close to the main house, and assorted outbuildings. The road across the causeway to the main house is a public road. All other roads on Mill Isle are private.

to the protection provided to reasonable expectations of privacy, which exceptions are "jealously and carefully drawn". *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). Some of these searches give us no pause; others merit close analysis.

### A. *The Navigational Chart*

Appellant first challenges the boardings and examinations of his boat, the COLD DUCK, that led to the seizure of a navigational chart. We have no difficulty approving the first boarding on the evening of May 13. At that point, a boat of unknown origin had been abandoned at a mooring belong to another person, where it remained for over twelve hours, fouled in its lines. A boat, like an automobile, carries with it a lesser expectation of privacy than a home or an office. *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925).[3] A boat, even more than an automobile, becomes a matter of legitimate concern to public safety officials when it is found abandoned, 250 yards from shore, its dinghy still on board. The responsibility of state officials for the safety of property was triggered by these circumstances. *See Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) (state officials' "community caretaking functions" for vehicles involved in accidents). More important, the circumstances justified a reasonable fear of injury to life and limb, specifically a drowning. Such a combination of "community caretaking functions" and possibly exigent circumstances amply justified intruding upon the limited privacy expectations surrounding an abandoned vessel in order to determine ownership of the boat and the safety of its mariners. *Cf. Michigan v. Tyler*, 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978) (exigent circumstances allow warrantless intrusion to perform administrative function).

The following morning, Deputies White and Kinney boarded the COLD DUCK for what developed into a more extensive search. Because the officers had a duty to deal with abandoned property, *see Cady v. Dombrowski, supra*, the boarding itself was justified by the need to clear the vessel of its fouled moorings and secure it to a nearby dock, as the owner of the mooring desired. The search that took place during and after the securing of the vessel, however, presents a more substantial question.[4] It was this search that yielded the chart that led the officers to Mill Isle and the marijuana. Hours before this search, both the sheriff's department and the Coast Guard had each called in the DEA. The deputies noticed marijuana cigarettes and poorly installed electronic equipment soon after boarding the boat. We find it hard to believe that they did not smell a smuggler soon after, if not before, they boarded the boat. If these facts, and no others, were presented to us, we would be hard pressed to approve the seizure and use of the chart. The Fourth Amendment does not countenance warrantless "exploratory rummag-

---

**3.** By so saying, we do not intend to imply that all of the doctrinal gloss applicable to automobiles is also applicable to boats. Nor do we purport to deal with such specialized craft as houseboats or vessels obviously used as homes. But it has long been recognized that boats, like automobiles, are subject to frequent limited intrusions by regulatory and safety officials. Such limited intrusions as warrantless safety and document checks of vessels are undoubtedly constitutional. *United States v. Warren*, 578 F.2d 1058 (5th Cir. 1978) (en banc); and the mobility of an ocean vessel in many ways exceeds that of a car, justifying warrantless intrusion without probable cause for customs inspection far from the technical borders of the United States. *United States v. Ingham*, 502

F.2d 1287 (5th Cir. 1974), *cert. denied*, 421 U.S. 911, 95 S.Ct. 1566, 43 L.Ed.2d 777 (1975). Given such characteristics, the privacy expectations of a boat owner are necessarily limited. *See Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973).

**4.** Appellant argues at length that the trial court was clearly erroneous in finding that the deputies seized the chart before the boat was towed in. The record is admittedly unclear as to when the chart was found, but in view of our decision concerning the legality of the search as a whole, we find it unnecessary to decide exactly when the chart was discovered.

ing" on every unattended vessel that smells of smuggling. *See Coolidge v. New Hampshire, supra,* 403 U.S. at 467, 91 S.Ct. 2022.

■ We are not, however, faced with a clear case of exploratory rummaging. Rather, three factors enable us to say that the search by White and Kinney was constitutional, despite the lack of a warrant. First, the district court found as a fact that a legitimate non-criminal purpose, investigation of a drowning, motivated White and Kinney's search. Second, the court found that the search was limited in scope to that purpose. Appellant argues that we must reject these findings as clearly erroneous, in the main because the sheriff's department had an address for the owner of the boat. We cannot agree that where there is an emergency need to obtain information in a non-criminal investigation the authorities are limited to pursuing one clue.[5] Moreover, divers in the employ of the sheriff's department were searching for bodies in the waters around the COLD DUCK at the same time that White and Kinney conducted their search. Such is clear evidence that a drowning investigation was being conducted.

■ The third factor is the Court's teaching in *Michigan v. Tyler, supra.* In *Tyler,* the Supreme Court sanctioned the initial warrantless, non-criminal search for evidence of the cause of a fire. Just as fire officials have a duty to seek the cause of a fire, the deputies in this case had a duty to seek the explanation for, and possible victims of, an apparent nautical mishap. In *Tyler,* such a search was permissible without a warrant for so long as the possible rekindling of the fire created an exigent situation. The circumstances of this case were equally, if not more exigent. Even more than the possible resurgence of the

fire in *Tyler,* the tides of Maine made it likely that the object of the search, a body, would disappear if the search were delayed. Moreover, if exigent circumstances justify warrantless entry and seizure of evidence of arson, which evidence is inevitably criminal, then an emergency certainly justifies entry and seizure of a navigational chart, relevant to a possible drowning, which by happenstance later proves to be incriminating.[6] *Cf. United States v. Warren,* 578 F.2d 1058 (5th Cir. 1978) (en banc) (permissible for Coast Guard inspection boarding to develop into criminal search).

■ To summarize, appellant's limited expectations of privacy in the COLD DUCK, already minimized by its abandonment at an unauthorized mooring, were not violated by entry pursuant to a reasonable belief that an emergency required an immediate search. The owner of the vessel had been missing long enough to trigger a reasonable belief of danger to life and limb and not so long as to make the proffered emergency a mere pretext. The resulting search was "strictly circumscribed by the exigencies that justif[ied] its initiation." *Terry v. Ohio,* 392 U.S. 1, 25–26, 88 S.Ct. 1868, 1882, 20 L.Ed.2d 889 (1968). The chart was in plain view on the floor of the cabin. Its discovery was inadvertent. Opening it up was not exploratory rummaging, but rather went directly to the purpose of the officers' presence. *See Marron v. United States,* 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927). As in *Michigan v. Tyler,* it was self-evidently relevant to the non-criminal purpose of the investigation (finding the mariners) and therefore need not be self-evidently incriminating in order to fit squarely within the plain view exception articulated in *Coolidge v. New Hampshire, supra.*

---

5. Indeed, had the authorities restricted their search to investigating the Woolwich post office box address, they would have found themselves with an empty house, no further information on the apparently lost mariners, and several hours lost.

6. Nothing in *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) is to the

contrary. *Mincey* dealt with a proffered "homicide scene" exception to the warrant requirement where there was no possibility that injured victims still needed aid and where all victims of the incident had been located. *Mincey* expressly distinguished the situation in the instant case. Finally, *Mincey* dealt with a four-day, minute search of a dwelling; we deal with

## B. *Detention of Appellant for Questioning*

As noted above, Deputy White apprehended appellant after a high speed chase beginning in Georgetown Center and ending some four miles later. Appellant now claims that when he drove his Blazer back to the marina, with Deputy White escorting from behind, he was already subject to arrest and that the arrest was made without probable cause. Appellant also argues that the events at the marina, which led to appellant's formal arrest, are tainted as the fruit of an illegal arrest.

As a preliminary matter, we lack, perhaps understandably, a full analysis below of the facts and law pertaining to the initial detention of appellant.[7] We note that appellant did preserve the issue in his suppression argument. At oral argument on the suppression motion, the government took the position that the precise nature of the initial detention (investigative stop or full arrest) was irrelevant since Deputy White had probable cause for arrest. At oral argument on appeal the government refused to concede that Deputy White needed probable cause for arrest to justify the detention under the Fourth Amendment, but failed to offer us an alternative standard for evaluating what was clearly more than a brief investigatory stop under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

We therefore rely on the record and the few facts found concerning the initial stop. The record reveals that after stopping appellant, Deputy White asked for and received his license and registration. After appellant, in response to questioning, identified himself as the owner of the COLD DUCK, Deputy White asked him to return to the marina for questioning. There is no evidence that appellant objected. Nevertheless, the deputy retained appellant's license and registration during the drive back to the marina. This testimony was uncontradicted.[8]

Given this testimony, the trial court stated in its finding of facts that the appellant "agreed" to accompany the deputy back to the marina. Because appellant was most cooperative with the authorities in the ensuing discussions at the dock, we could easily credit this finding of consent, had the deputy not retained the license and registration. Appellant could not lawfully operate his vehicle without those papers. He was not free to go. Although the line between an investigatory stop and an arrest has yet to be fully defined (*see, e. g., United States v. Worthington,* 544 F.2d 1275, 1281–88 (5th Cir. 1977) (Goldberg, J., dissenting)), when appellant was so significantly deprived of his liberty of movement for a substantial time, this was, if not an arrest, closer along the detention spectrum to an arrest than to an investigatory stop. *See Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969); *United States v. McCaleb,* 552 F.2d 717, 720 (6th Cir. 1977); *United States v. McDevitt,* 508 F.2d 8, 11 (10th Cir. 1974); *United States v. Maslanka,* 501 F.2d 208, 213 n. 10 (5th Cir. 1974), *cert. denied sub nom. Knight v. United States,* 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975). Such investigatory detention requires more justification than the founded suspicion underlying a brief stop. *Davis v. Mississippi, supra,* 394 U.S. at 726–27, 89 S.Ct. 1394; *see United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). In the absence of any argument that an intermediate procedure falling between a stop and an arrest was either intended or authorized here, we must reject the government's position that probable cause for arrest was not required to justify the detention.

The government also argues that Deputy White had probable cause to arrest appellant for either of two crimes, speeding and unlawfully furnishing a scheduled drug.

---

a brief examination of a vessel constantly subjected to official contact.

**7.** Given the number of challenges made by the appellant and the limited argument addressed to the original stop, we are not surprised by and cannot fault this single omission.

**8.** The record does not support the government's contention at oral argument that appellant may have consented prior to seizure of his license and registration. Deputy White's testimony on the sequence of events is to the contrary.

Although Maine statutes provide the usual plethora of regulations relating to the operation of motor vehicles, 29 M.R.S.A. § 1252(4) (West 1978) does not make speeding criminal until the operator exceeds the statutory limit by thirty miles per hour or more. As we have noted, appellant accelerated rapidly as soon as he saw Deputy White driving in the opposite direction in Georgetown Center. The speed limit at that point was 35 miles per hour. Deputy White immediately turned around and gave chase. The trial court found that the deputy travelled two miles at 90 miles per hour in order to catch up with appellant and then paced appellant at 70 miles per hour for another two miles. The unposted statutory speed was 45 miles per hour. Thus, appellant argues that on the face of the record, Deputy White lacked 5 miles per hour to justify a speeding arrest.

We think the matter is not so simple. The statute authorizing warrantless arrests in these circumstances, 15 M.R.S.A. § 704 (West 1965 & Supp.1978), directs a deputy to "arrest and detain persons found violating any law of the State . . ." The word "found" has been interpreted to require that the offense be committed in the presence of the officer. *United States v. O'Donnell,* 209 F.Supp. 332 (D.Me.1962). In *State v. Cowperthwaite,* 354 A.2d 173 (Me.1976), the Maine Supreme Judicial Court has interpreted the presence requirement as allowing arrest where the facts confronting an officer give him probable cause to believe that the offense is being committed. An officer may draw reasonable inferences from the immediate observations of his senses. *Id.* Applying this rule to the facts in this case, we find that Deputy White was statutorily and constitutionally authorized to arrest the appellant for speeding. Although the deputy never clocked the appellant at speeds 30 miles per hour in excess of the statutory limit, the deputy did know how much head start the appellant had and did know that speeds of 90 miles per hour, at first in a 35 miles per hour zone, were needed to catch the appellant. Probable cause for arrest does not require the quantum of proof necessary to convict. *United States v. Ventresca,* 380

U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). Under the standards governing Deputy White's conduct, "the facts and circumstances within the knowledge of the officer . . . were sufficient to warrant a prudent and cautious man in believing that the arrested person had committed" the offense of speeding. *State v. Fletcher,* 288 A.2d 92, 97 (Me.1972) (*quoting State v. Smith,* 277 A.2d 481, 488 (Me.1971)).

Appellant next argues that even if Deputy White had probable cause to arrest for speeding that such an arrest would be patently pretextual. This court has stated in the context of traffic arrests that lead to information about more serious crimes:

> "[W]hile we do not say that there could never be an egregious situation where an arrest on purely colorable grounds might be held invalid as 'pretextual', *cf. Taglavore v. United States,* 291 F.2d 262, 265 (9th Cir. 1961), the validity of an arrest is normally gauged by an objective standard rather than by inquiry into the officer's presumed motives. If this were not so, an arrest's validity could not be settled until long after the event; it would depend not only on the psychology of the arresting officer but the psychology of the judge." *United States v. McCambridge,* 551 F.2d 865, 870 (1st Cir. 1977).

We acknowledge that *McCambridge* is distinguishable from the instant case insofar as the arresting officer in *McCambridge* had no suspicions about more serious crimes at the time of the traffic arrest. Nevertheless, we feel that founded suspicions that a person has committed one crime do not disable an officer from making a probable cause arrest based upon the operation of a vehicle during guilty flight from the officer's reasonable attempts to question that person. The Fifth Circuit has upheld a traffic arrest on facts very similar to those in the present case. *United States v. Maslanka,* 501 F.2d 208, 213 n. 10 (5th Cir. 1974). We agree with its reasoning that a traffic arrest after a high speed chase, even where the cause of the chase is founded suspicion of a more serious crime, is clearly distinguishable from the case of officers

having mere suspicions who carefully lie in wait until a minor traffic infraction gives them a pretext to confirm their suspicions. In the same vein, the cases cited by appellant to support his "pretext" argument (*e. g., United States v. Montgomery,* 182 U.S. App.D.C. 426, 561 F.2d 875 (1977) involved officers acting without articulable facts to support any suspicion and using registration checks (*not* arrests for crimes) as pretexts for searches. As explained more fully below, Deputy White had numerous facts to support his suspicions, had every reason to give chase, and in the process was presented with completely independent probable cause to arrest for speeding.

 Even if our construction of Maine traffic statutes should prove faulty, we think that Deputy White nevertheless had probable cause to arrest appellant—for drug trafficking. Viewed in isolation, the individual facts known to the deputy may have been consistent with innocent explanations, but taken as a rapidly developing whole, the facts justifying appellant's apprehension were consistent with good, constitutional police work.[9] The deputy knew that a large yacht had recently been purchased for cash in small denominations, by a man who had asked for two receipts showing different prices for the boat. He could reasonably infer that not only did the new owner not want to be traced but also that the new owner wanted to deceive someone about the amount of cash he had available. White knew that the new owner had recently installed expensive long range navigation equipment in a sloppy fashion. He could reasonably infer that the owner planned to or had made an ocean voyage and was in a hurry. On that boat was a chart showing a course approaching Mill Isle, a secluded location with a deep water harbor suitable for smuggling and located near an area already under investigation as a smuggler's port, plus evidence of recent use of small amounts of marijuana, not in and of itself a crime but grounds to support an inference that the boat was involved with drug traffic. This suspicious craft had been abandoned at night at an unauthorized mooring and been unclaimed for more than 24 hours. Then the owner arrived. Rather than investigate the presence of uniformed officers on the vessel he had so carelessly left behind, the owner sped away in what can only be characterized as guilty flight. Finally, upon seeing a uniformed officer observing him in Georgetown Center, the owner once again fled the authorities, speeding down a winding road past the entrance to the marina. At this point, Deputy White had not seen more than 1½ ounces of marijuana associated with the defendant,[10] but these facts were sufficient to warrant a reasonable and prudent man's belief that appellant had been engaged in "furnishing" under 17–A M.R.S.A. § 1106(3), if not a more serious crime.

Attempting to minimize the cumulative impact of these facts, appellant cites cases holding that arrest at an airport of persons meeting the DEA's "drug courier profile" is not supported by probable cause. *See United States v. McCaleb,* 552 F.2d 717 (6th Cir. 1977). The simple answer to appellant's contention is that this case presents "profile plus". "The element missing in *McCaleb* and present in the case at bar is a reasonably inferred tie-in with unlawful trading in narcotics." *United States v. Canales,* 572 F.2d 1182, 1186 (6th Cir. 1978) (finding founded suspicion for *Terry* stop). Had the defendants in *McCaleb* been associated with a suspected smuggling operation and then twice fled from the authorities, we feel certain that the resolution on the probable cause issue would have been different. The importance of flight or other behavior signifying guilt as a final link in a chain of probable cause is underscored in a number of cases. *See United States v. Maslanka,*

---

**9.** We note in passing that, unlike the state law relating to most warrantless arrests, the special statute then governing warrantless arrests for drug possession and trafficking did not require the offense to be committed in the presence of an officer. *See* 17–A M.R.S.A. § 1113 (West Supp.1978) (repealed by P.L.1978 ch. 671 § 26).

State law governing Deputy White's authority to arrest without a warrant expressly required only probable cause.

**10.** Possession of less than 1½ ounces of marijuana is not a criminal offense under Maine statutes. 22 M.R.S.A. § 2381.

*supra; Defino Martone v. United States,* 396 F.2d 229 (1st Cir. 1968); *United States v. Brown,* 457 F.2d 731 (1st Cir. 1972); *United States v. Berkowitz,* 429 F.2d 921 (1st Cir. 1970).

### C. *The Fruits of the Blazer*

Appellant next objects to the admission of evidence seized from his vehicle while it was parked at the marina. As explained above, upon reaching the marina in the company of Deputy White, appellant left his truck and boarded the COLD DUCK. There he had a lengthy conversation with DEA Agent Drinan. Deputies White, Kinney, and Setlar remained in the lot, admiring the truck. Appellant had left the door open on the driver's side. The deputies observed marijuana debris on the carpeting. The deputies closed and locked the truck and apprised Agent Drinan of their observations. After discussing the possible penalties for smuggling with appellant, Drinan seized the COLD DUCK. Drinan and appellant then left the boat and appellant unlocked the truck. Drinan searched four suitcases found in the back of the vehicle. Having discovered hashish in one of the suitcases, Drinan placed appellant under formal arrest and seized the vehicle. A thorough search of the vehicle ensued and yielded a key, which was later found to fit one of the locks on Mill Isle. Appellant objects to the admission of the debris, the hashish found in the suitcase, and the key. We treat each item separately.

### 1. *The Marijuana Debris*

Appellant's arguments on this issue give us little difficulty. Appellant had a very limited expectation of privacy in his truck. *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). Appellant completely eliminated any such expectation by leaving the door open. Any passerby could have seen the marijuana on the floor of his truck. The trial court expressly found that the deputies were not attempting to search the vehicle. Appellant does not contend that the deputies were not lawfully present outside his vehicle. There-

fore, the discovery of the marijuana debris falls squarely within the plain view exception. *See Coolidge v. New Hampshire, supra.*

### 2. *The Suitcases*

The Supreme Court's decision in *United States v. Chadwick,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), establishes that the presence of luggage in an automobile does not necessarily vitiate expectations of privacy that attach to the contents of the luggage. Accordingly, the government has not argued that the search of appellant's luggage was permissible under either the "search incident" or the "automobile" exception. Rather, the government argues, and the trial court found, that appellant consented to the search of the luggage.

The existence of consent and the voluntariness thereof are questions of fact to be determined from all the circumstances surrounding the search. *Schneckloth v. Bustamonte,* 412 U.S. 218, 246–47, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). A trial court's finding of voluntary consent will not be reversed unless it is clearly erroneous. *United States v. Cepulonis,* 530 F.2d 238, 243 (1st Cir.), *cert. denied,* 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 834 (1976). Although we find the issue of consent-in-fact, as opposed to the voluntariness thereof, to be a close one, we find no clear error here.

As discussed more fully below, the circumstances surrounding the search of the suitcases had few, if any, of the inherently coercive characteristics that negate a finding of voluntariness. *See United States v. Watson,* 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976); *Schneckloth v. Bustamonte, supra.* Because appellant never expressly consented to the search, however, we are faced with the more difficult question of when consent may be inferred from action. Appellant urges us to adopt the standard espoused in *United States v. Abbott,* 546 F.2d 883 (10th Cir. 1976). *Abbott* held that the acts from which consent is inferred must be "unequivocal and specific". *Id.* at 885. Because the *Abbott* court selected this evidentiary standard while

characterizing consent to search as a "waiver of a fundamental right" (*id.*), a characterization and a mode of analysis expressly rejected in *Schneckloth v. Bustamonte, supra,* we are not convinced that the trial court's conclusion should be subjected to such close scrutiny. Indeed, in *United States v. Cepulonis, supra,* 530 F.2d at 244, we deferred to the trial court's resolution of equivocal evidence of consent. Nevertheless, even if we apply, *arguendo,* the "unequivocal and specific" standard, we think that the inference of consent was proper on the facts of this case. Appellant's conversation with Drinan aboard the COLD DUCK was relaxed and casual. Appellant was cooperative, and when he did not wish to be helpful he clearly drew the line. Upon returning to the parking lot, appellant unlocked the truck for Drinan.[11] Simply unlocking a vehicle, without saying a word, has been held sufficient to support an inference of consent-in-fact. *United States v. Almand,* 565 F.2d 927 (5th Cir.), *cert. denied,* —— U.S. ——, 99 S.Ct. 92, 58 L.Ed.2d 116 (1978). Even if, however, the act of unlocking a vehicle, without more, might not support an inference of consent to search luggage contained therein, appellant's act in this case does support the ultimate finding of consent-in-fact.

More important than the foregoing prelude to the search of the suitcases is appellant's behavior at the time of the search. Agent Drinan first removed the four suitcases from the Blazer. Then, before attempting to open each one, the agent asked appellant if he owned the bag. In each case, appellant denied both ownership and any knowledge of the owner of the bag. The first three bags were unlocked and their contents unincriminating. The fourth had a combination lock. Although denying ownership, the appellant stated that he thought he could unlock it and proceeded to do so. Given appellant's demonstrated ability to choose whether or not to cooperate, we think that the disclaimer of any knowledge or interest in the luggage together with the unlocking of the incriminating bag clearly support an inference of consent-in-fact. We find support for this holding in the rule adopted by the Fifth and Ninth Circuits that one who denies any interest in luggage has abandoned the property and thereby loses any standing to challenge an ensuing search. *See United States v. Jackson,* 544 F.2d 407 (9th Cir. 1976); *United States v. Anderson,* 500 F.2d 1311 (5th Cir. 1974); *United States v. Colbert,* 474 F.2d 174 (5th Cir. 1973) (en banc). Although we are not convinced that the property law analysis of abandonment ought to be applied where the issue is a reasonable expectation of privacy (*see Katz v. United States, supra* ), we reach the same result by reasoning that one who disclaims any interest in luggage thereby disclaims any concern about whether or not the contents of the luggage remain private. *See United States v. Berkowitz,* 429 F.2d 921, 925 (1st Cir. 1971) (disclaimer of interest in allegedly stolen goods vitiates any Fourth Amendment interest in goods).

Finally, we find support in our holding in *Robbins v. MacKenzie,* 364 F.2d 45 (1st Cir.), *cert. denied,* 385 U.S. 913, 87 S.Ct. 215, 17 L.Ed.2d 140 (1966), that opening and stepping away from the door to an apartment is implied consent to entry and observation by a police officer who knocks.[12]

---

11. Defendant argues at length that the trial court was clearly erroneous in finding that appellant unlocked both the door and the trunk of the vehicle. We note that the record supports appellant's contention that appellant unlocked the door and Drinan the rear hatch of the Blazer. Appellant's arguments are irrelevant, however, for two reasons. First, appellant's vehicle, a van without a separate trunk, was opened from stem to stern when he unlocked one door. More important, cooperation in opening any one of the routes into the vehicle is, in our view, just one piece of evidence amongst many that support an inference of consent-in-fact.

12. Indeed, the evidence supporting an inference of consent is stronger in this case than it was in *Robbins.* In *Robbins* the officer and the occupant exchanged no words. In this case, Agent Drinan asked appellant if he could open the combination lock and appellant replied that he would try. Such a response is closely akin to the express permission to enter that the dissent felt should be required in *Robbins,* 364 F.2d at 52–54 (Coffin, J., dissenting).

Nor does appellant's citation of *United States v. McCaleb, supra,* persuade us to the contrary. *McCaleb* held that the act of unlocking a suitcase will not support an inference of consent. *McCaleb* involved an illegal stop based upon a "drug courier profile" and an illegal detention for questioning in unfamiliar surroundings. Moreover, the agents in *McCaleb* misrepresented their authority to obtain a warrant to open the suitcase. Such circumstances are inherently coercive (*see United States v. Watson, supra*). Such are not the circumstances of this case. The finding of consent-in-fact was not clearly erroneous.

 Many of the factors that support an inference of consent also support the finding of voluntariness. Accordingly, we discuss them only briefly here. Appellant is a man of average education and intelligence. He demonstrated his ability to use that intelligence to avoid incriminating himself in his discussions with Drinan. Appellant had been informed of, and indicated his understanding of, his *Miranda* rights twice before the suitcase search. No lengthy detention or physical abuse was involved. Rather, although we have held that appellant was technically under arrest when asked to return to the marina, the atmosphere of his "detention" had none of the coercive aspects involved in questioning at the stationhouse. *See United States v. Watson, supra,* 423 U.S. at 424, 96 S.Ct. 820. In short, all of the criteria of voluntariness set forth in *Schneckloth v. Bustamonte, supra,* were met here.[13]

### 3. The Key

 Having arrested appellant for possession of the hashish found in the locked suitcase, Agent Drinan seized the Blazer under the authority of the forfeiture statutes, 21 U.S.C. §§ 878(4) & 881(b)(1)(4). The Blazer was then immediately searched. We think that the key found in the Blazer was appropriately seized as evidence revealed during an inventory search.

In *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), the Supreme Court reaffirmed the right of the authorities to search the interior of a seized vehicle in order to secure personal property contained therein. Such a search protects both the owner and the police. If such a search reveals evidence, the police may seize it. *Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); *United States v. McCambridge, supra,* 551 F.2d at 870–71. Appellant objects, however, that the seizure of the key transmutes the inventory search into an investigatory search.[14] Appellant reasons that because the key was not obviously criminal evidence and became evidence only when the officers found that it fit the door to the main house at Mill Isle ten days later, the use of the key was investigatory and therefore exceeded the bounds of the caretaking function countenanced by *South Dakota v. Opperman, supra.*

In our view, appellant is quibbling with Agent Drinan's decision that the key might be relevant to prove the charge for which appellant was arrested—possession and transportation of drugs. We think *Cooper v. California,* 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967), is dispositive of this claim. In *Cooper,* the defendant was arrested for selling heroin and his car forfeited for transporting contraband. A warrantless search of the glove compartment of the seized auto revealed a scrap of brown paper similar to, but larger than, scraps

---

**13.** We are not convinced by appellant's argument that Drinan coerced consent by asking appellant to cooperate and by pointing out the possible maximum sentences for smuggling. In *United States v. Race,* 529 F.2d 12 (1st Cir. 1976), we held that an hour-long negotiation with the prosecutor prior to consenting to search did not eliminate the voluntariness of that consent. Nor did Drinan's assertion that he would seek a warrant if appellant did not consent make consent involuntary. "Bowing

to events, even if one is not happy about them, is not the same thing as being coerced." *Robbins v. MacKenzie, supra,* 364 F.2d at 50.

**14.** Appellant does not object to the method of the search and we therefore need not reach the government's argument that seizure pursuant to a forfeiture statute permits a full-blown investigatory search of a vehicle. *See United States v. Johnson,* 572 F.2d 227 (9th Cir. 1978).

used to wrap heroin allegedly sold by the defendant. The Supreme Court approved the seizure of the paper as reasonably related to the arrest and the purpose of the forfeiture. In other words, the scrap of paper could be probative of the charge against the defendant and the vehicle.

■ In a similar vein, appellant in this case was arrested for possession and his two vehicles seized for transporting contraband. Unlike the paper in *Cooper*, the key may not have been obviously evidence when agent Drinan first took it into custody. Nevertheless, it became obvious evidence before the reasonable process of an inventory search was completed. Pursuant to DEA regulations, Drinan removed all personal property not a part of the seized vehicle. Long before he had an opportunity to write out an inventory of the vehicle's contents and return them, the discovery of the cache at Mill Isle made it highly likely that the key was evidence. Marijuana debris on the floor of the seized vehicle indicated a likelihood that appellant had carried more contraband than was found in the Blazer. The vacuum cleaner and the tire tracks indicated that appellant and the Blazer were associated with Mill Isle. Even before the discovery of the cache, Drinan learned that appellant was not living at his stated address. If a man falsely states his address and other evidence indicates he is living at the scene of a crime for which he has been arrested, his house key is obviously evidence. Were the law to require that officers, legitimately in possession and legitimately made aware of the evidentiary value of such an item, go through the motions of obtaining a warrant, it would, we think, be a purely ritualistic deference to formality. We see no increased protection which would thereby be assured a suspect's rights. We therefore hold that the key was properly seized as evidence discovered during an inventory search.

## D. *The Warrantless Search of Mill Isle*

■ With appellant securely ensconced in a cell in the Sagadahoc County Sheriff's Office, Agent Drinan and Deputies Brawn and Setlar drove to appellant's Woolwich address. They found an empty house and neighbors who told them that "Jackie" had moved out several weeks earlier. Recalling the course marked on the chart found on the COLD DUCK, the officers then proceeded to Mill Isle to question the inhabitants about any suspicious activities they might have observed. The officers went first to a chalet, the smaller and more remote of two dwellings on the island, and observed marijuana debris covering the dock adjacent to the chalet. After finding no one in at the chalet, the officers then proceeded via a dirt road across the island toward the main house. On the way, they observed tire tracks leading off the road toward a tarpaulin. Twist ties for plastic bags and marijuana debris surrounded the tarpaulin. Under it was a bale of marijuana.

Appellant's attack upon the warrantless seizures involved here is based upon an assertion that a privacy expectation surrounded the entire Mill Isle property and that the authorities violated that interest by going to the farthest reaches of the property to search. Our first problem with this argument is that not only was the property not posted, but the trial court expressly found that the officers entered the property to inquire of the residents about the COLD DUCK, not to search. This finding was based upon uncontroverted testimony. Given the trial court's unique opportunity to evaluate the credibility of witnesses, we cannot upset the finding of the intent of the officers.

■ Where an owner has not attempted to secure open fields and woods from "invasion" by a casual, or an official visitor, a police officer may cross private land in order to question the inhabitants of dwellings thereon. *United States v. Hersh*, 464 F.2d 228 (9th Cir.), *cert. denied*, 409 U.S. 1008, 93 S.Ct. 442, 34 L.Ed.2d 301 (1972); *United States v. Knight*, 451 F.2d 275 (5th Cir. 1971); *see Patler v. Slayton*, 503 F.2d 472 (4th Cir. 1972) (no privacy interest in unposted target range behind farm). The land involved here was not

posted; there was no fence or chain to impede visitors; the officers approached openly in broad daylight. Thus, the entry was permissible. *See United States v. Hersh, supra; United States v. Brown*, 457 F.2d 731, 733 (1st Cir. 1972) (entry upon land to investigate reports of abandoned vehicles in woods and to inquire of inhabitants permissible). The cases cited by appellant to the contrary all involved an impermissible initial intent to search. *E. g., United States v. Holmes*, 521 F.2d 859 (5th Cir. 1975).

The trial court also credited testimony and physical evidence showing that the approach to the chalet put the dock in plain view and that the discovery of the marijuana debris on the dock was inadvertent. We have no basis to overturn these findings. The trial court also found that despite the officers' attempts to look in the windows of the chalet, the officers' continued observations did not become a search. Although as an original matter we might be quite suspicious of continued wanderings that revealed more evidence in "plain view" (*cf. Coolidge v. New Hampshire, supra*), there is ample evidence to support the trial court's finding that the officers crossed the island solely to inquire at the main house.

■ Assuming, as we must, that the trip across the island was permissible, the bale of marijuana discovered in plain view beside the road was properly seized. As in *Patler v. Slayton, supra*, (spent bullets dug out of target range in open field), the appellant could not reasonably expect privacy when he left a bale of marijuana in the open, even under a tarpaulin. If no expectation of privacy was reasonably involved, there was no search. *See Air Pollution Variance Bd. v. Western Alfalfa Corp.*, 416 U.S. 861, 94 S.Ct. 2114, 40 L.Ed.2d 607 (1974); *United States v. Freie*, 545 F.2d

1217 (9th Cir. 1976), *cert. denied sub nom. Gangadean v. United States*, 430 U.S. 966, 97 S.Ct. 1645, 52 L.Ed.2d 356 (1977) (stack of cartons containing marijuana under tarpaulin in plain view from airfield; no search); *United States v. Pruitt*, 464 F.2d 494 (9th Cir. 1972). In *Pruitt*, the appellants had no reasonable expectation of privacy in marijuana stuffed in duffel bags and hidden under bushes. The court noted: "Any casual passerby would feel perfectly free to ascertain what it was that he had found. The only justified expectation of those who had secreted the marijuana was that the cache would remain secure against intrusion only so long as it remained undiscovered." *Id.* at 496. *Pruitt* did not involve a private road across private land. Nevertheless, because the appellant made no attempt to secure his open land from unwanted visitors, we find that the same analysis applies to these facts where the marijuana lay beside a road, a quarter mile from any habitation, and surrounded by twist ties and marijuana debris.[15]

### Admission of Appellant's Statements

■ Appellant objects to the admission of two statements as violative of his Fifth Amendment rights.[16] He first objects to the admission of his colloquy with Agent Drinan during the drive from Bath to Portland. The trial court found a number of facts supporting its conclusion that appellant's admissions were voluntary. Such facts stand unless clearly erroneous. *United States v. Jobin*, 535 F.2d 154, 156 (1st Cir. 1976). Appellant had been advised of his right to remain silent three times before he made incriminating statements. He had indicated his understanding of those rights. Although appellant refused to sign the printed waiver form, there are no facts

15. Appellant's last search and seizure argument does not merit discussion in the text. Few of appellant's minute objections to allegations in the affidavit seeking a warrant to search Mill Isle were properly preserved below. Those few objections properly raised below involve allegations that were neither intentional nor material misstatements. *See Franks v.*

*Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

16. We need not address appellant's arguments that his admissions were the tainted fruit of illegal searches and seizures (*see Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)) because we have found the evidence involved was legally obtained.

tending to show that he had the misimpression that failure to sign immunized his statements. Thus, the concerns we expressed in *United States v. Van Dusen*, 431 F.2d 1278 (1st Cir. 1970), are not present here.

Appellant argues that his statements could not have been voluntary because he was repeatedly questioned. We note from the record, however, that Agent Drinan ceased questioning whenever appellant indicated he did not want to answer. Moreover, Drinan renewed his questioning only when new evidence revealed that there was a large scale operation afoot and that appellant was the key to that operation. Such is good police practice, not impermissible coercion. The trial court found on an ample record that appellant never asked that all questions cease or that he be represented by counsel. Rather, he picked those questions he wanted to answer and declined others. Such evidence not only demonstrates a knowledge of the right to remain silent but also the intelligence and will to vindicate that right. Appellant was not subjected to physical abuse or deprivation of food or nourishment. Indeed, it was just after a light meal that appellant himself initiated the conversation in which he incriminated himself. There was no error in the trial court's finding of voluntary waiver.

■ Appellant next objects to the use at trial of his statement at his bail hearing that his residence was Mill Isle. Appellant's theory is that he was forced to make an unconstitutional choice between two fundamental rights, the right to remain silent when admission of any connection with Mill Isle would incriminate him and the Eighth Amendment right to release on bail under reasonable conditions. Our answer is threefold. First, appellant did not have an unconditional constitutional right to release on bail. *United States v. Abrahams*, 575 F.2d 3 (1st Cir.), *cert. denied*, —— U.S. ——, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978). Thus, the right he places in balance

here is different from the Fifth and Fourth Amendment rights held in balance in *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968) (Fifth Amendment requires exclusion of testimony at suppression hearing to establish standing to raise Fourth Amendment challenge). Second, the appellant has not shown us that exercise of his Fifth Amendment rights at the bail hearing would have resulted in denial of release.[17] The length of residence in the community is only one of many factors taken into consideration in establishing the terms of release in the discretion of the magistrate. 18 U.S.C. § 3146(b).

■ Finally, "[t]he criminal process, like the rest of the legal system, is replete with situations requiring 'the making of difficult judgments' as to which course to follow. . . ." *McGautha v. California*, 402 U.S. 183, 213, 91 S.Ct. 1454, 1470, 28 L.Ed.2d 711 (1971). Given the limited nature of the Eighth Amendment "right" the appellant feared he might lose by remaining silent, we can say, as we have said on very similar facts: "the right not to speak embodied in the Fifth Amendment is not equivalent to a right to volunteer information to the government under a grant of immunity." *Flint v. Mullen*, 499 F.2d 100, 102 (1st Cir. 1974). *See Spinelli v. United States*, 382 F.2d 871, 891–92 (8th Cir. 1967), *rev'd on other grounds*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969) (no exclusion of bail-hearing testimony on residence even though information on residence both essential to bail and incriminating).

### Other Crimes Evidence

■ Appellant lists under this general heading three separate challenges to the admission of evidence and prosecutorial argument based thereon. The only challenge fully preserved by objections in the district court is to the admission of testimony about his purchase of another yacht, the HARVARD, four days before his arrest. Appellant claims such testimony was impermissi-

17. We reject as untenable appellant's argument that he did not knowingly waive his right to remain silent at the bail hearing. He was represented by counsel and the magistrate warned him that anything he said could be used against him.

ble other crimes evidence. F.R.Evid. 404(b). The government argues that appellant's purchase of the HARVARD, a boat admittedly not involved in importing marijuana found at Mill Isle, was probative of his *modus operandi* and therefore of his identity as the smuggler at work at Mill Isle. We are not convinced that buying boats is a sufficiently unique act to counterbalance the prejudice arising from the government's inference that appellant was in the business of smuggling, a crime with which he was not charged. *See United States v. Myers*, 550 F.2d 1036, 1045 (5th Cir. 1977) (analyzing the uniqueness and similarity of uncharged offenses necessary to make them probative of the identity of the perpetrator of the act charged); *United States v. Eatherton*, 519 F.2d 603, 611 (1st Cir. 1975); *United States v. Barrett*, 539 F.2d 244, 248 (1st Cir. 1976). Although the balancing of prejudice and probative value is primarily the task of the trial court, *United States v. Eatherton, supra*, 519 F.2d at 611, we would be sorely pressed if the HARVARD were relevant only to method of operation. Such is not the case. A receipt for the HARVARD, showing appellant's name along with two others as purchasers, was found at Mill Isle. Given the proximity in time of the purchase and the importation (a few days apart at most) and given the necessity of marshalling evidence to link appellant with Mill Isle, *see United States v. Byrd*, 352 F.2d 570, 574 (2nd Cir. 1965), the trial court did not abuse its discretion.

■ Appellant next challenges the admission of evidence of the street value of the marijuana seized at Mill Isle. We note that street value is relevant to prove intent to distribute. *United States v. DiNovo*, 523 F.2d 197, 202 (7th Cir. 1975); *United States v. Hollman*, 541 F.2d 196, 200 (8th Cir. 1976). Appellant's argument that such proof was unnecessary given the tonnage involved and was therefore excludable because of its prejudicial impact (*see United States v. Hollman, supra*) might stir us if appellant had given the trial court an opportunity to balance prejudice and probative value. F.R.Evid. 403. Appellant's stated objection, however, was to the rele-

vance of street value and the hearsay nature of Agent Drinan's testimony on the subject. Appellant did not assert that any potential probative value of street value evidence might be outweighed by its prejudicial impact. Moreover, having failed to alert the trial court to the task at hand, appellant now declines to favor us with an argument concerning plain error. We see no plain error and reject this challenge.

Appellant's final evidentiary challenge, to prosecutorial argument based upon evidence of appellant's financial transactions prior to his arrest, merits even less consideration. Although appellant made one objection to "other crimes" inferences in the government's opening statement, he did not object to the admission of the evidence nor did he request a curative charge. Again, appellant's counsel knows that we must apply a plain error standard here, but argues as if his present position had been fully preserved below. There is no plain error.

### Sufficiency of the Evidence of Importation

■ We have recently restated the law and the authorities relating to the sufficiency of the evidence supporting a jury verdict in a criminal case. We evaluate the evidence in the light most favorable to the prosecution, with all inferences that may legitimately be drawn; the evidence need not not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt. *United States v. Gabriner*, 571 F.2d 48, 50 (1st Cir. 1978). We think the prosecution has met this standard.

■ Appellant argues at length that three decisions overturning jury verdicts on importation charges require that we reverse. The cases, *United States v. Maslanka*, 501 F.?d 208 (5th Cir. 1974), *United States v. Carrion*, 457 F.2d 200 (9th Cir. 1972), and *United States v. Meyer*, 432 F.2d 1000 (9th Cir. 1970), clearly stand for the proposition that mere possession of imported contraband is not sufficient to support a conviction for importation. Indeed, in *Carrion* the court held that a pilot who lands in

Los Angeles with a plane load of marijuana in packages marked with Spanish writing cannot be convicted of importation, even though he had burned enough fuel for a round trip to Mexico and had a matchbook from a Mexican restaurant in his pocket. Without commenting on the severity of this review of a jury's findings, we hold that *Carrion* and the other cases cited by appellant are distinguishable. In none of the cited cases did the defendant confess to importation. In the case at bar, appellant admitted that the marijuana at Mill Isle represented his "first run" and that what he had run was high quality marijuana from Colombia. Moreover, appellant was found in possession of Colombian-packaged marijuana on the coast of Maine, unlike the southwesterners found in possession of foreign items common within their area of the United States. Finally, the government presented evidence of long range planning in the form of boat and land purchases by the defendant. These facts, together with the size of the operation at Mill Isle and appellant's admission that the cache at Mill Isle was only part of his "run" permit a conclusion of guilt beyond a reasonable doubt.

### The Charge on Reasonable Doubt

Fueled by our recent decision in *Dunn v. Perrin*, 570 F.2d 21 (1st Cir. 1978), appellant vigorously challenges the trial court's explanation of the concept of reasonable doubt. Unfortunately, appellant failed to include any mention of this portion of the charge when raising a plethora of exceptions before the trial court. Given the marginal merit of appellant's challenges to specific language drawn out of context and the correctness of the charge taken as a whole, we have no difficulty concluding there is no plain error here.

### Sentencing

Appellant's last claim is that the trial court based its decision to impose maximum sentences on all counts upon legally impermissible considerations. The court was candid about its reasoning, which we set out in full in the margin.[18]

---

18. "In determining the sentences appropriate in this case, this Court has considered with care the very comprehensive and thorough presentence report prepared for its consideration; it has considered the statement very ably made by the United States Attorney as to the factors which this Court should appropriately consider, and also has, of course, considered the very able statement by the defendant's counsel, Mr. Petruccelli.

"The Court has also had the benefit of having personally presided at the trial of this defendant as a result of which the Jury returned its unanimous verdict of guilty under all three counts of the Indictment.

"At the outset, the Court is wholly convinced that the Jury arrived at the only verdict which it could have arrived at in this case. There is not the slightest doubt in the mind of this Court of this defendant's guilt of all three of the charges in this Indictment. The Court is further concerned because in light of all the information concerning the defendant which has developed at the trial and in the subsequent investigation, it is entirely evident that this defendant is simply the tip of the iceberg; that he is one in what unquestionably must have been and may very possibly still be a very substantial criminal operation directed toward the importation of Marijuana and very possibly other elicit *[sic]* drugs into this country through the coastline of the State of Maine.

"This Court cannot in determining the sentence appropriate in this case close its eyes to the fact that the defendant, despite the overwhelming evidence of his guilt, continues to deny guilt. The first step in rehabilitation, whether it be in an institution or probationary sentence setting, is, of course, the defendant's full, frank and complete admission that he has done wrong and is prepared to do better in the future.

"The Court also can't close its eyes to the fact that the defendant has consistently declined to co-operate in any way with the prosecuting and investigating officials in their efforts to bring into Court all of those who are involved in this very substantial operation. The sums of money involved in this operation, as disclosed at the trial, [are] clearly beyond any capacity of this particular defendant before the Court. He is undoubtedly aware of the sources of those funds. He has consistently declined and refused to co-operate in determining what that source may be.

"The Court is, of course, aware that the defendant is under no obligation to in any way incriminate himself. He was entitled to a trial. He has had a fair trial. His guilt has been determined. The Court feels compelled to impose the maximum prison term provided by the statutes for each of the three counts in this Indictment, in two instances including the spe-

■ Appellant concedes that as a general rule sentencing decisions are within the exclusive discretion of the trial court. *Marano v. United States*, 374 F.2d 583, 586 (1st Cir. 1967). There are, however, two established exceptions to this rule, where the trial court employs impermissible considerations in fixing sentence (*see id., LeBlanc v. United States*, 391 F.2d 916 (1st Cir. 1968)) and where the trial court refuses to "individualize" the sentence, basing it instead upon mechanistic application of rules unrelated to the defendant's character. *See United States v. Wardlaw*, 576 F.2d 932 (1st Cir. 1978); *United States v. Foss*, 501 F.2d 522, 527 (1st Cir. 1974). Appellant claims that the trial court's focus upon his failure to confess and cooperate in apprehending his confederates placed an impermissible "price tag" upon his exercise of his rights not to incriminate himself and to appeal his conviction. *See United States v. Rogers*, 504 F.2d 1079, 1084 (5th Cir. 1974). We do not agree.

As an initial matter, we recognize that there is a difference of opinion amongst the circuits concerning the extent to which a trial court may rely upon a defendant's failure to "repent" and "sing" when fixing sentence. *Compare United States v. Rogers, supra, and United States v. Garcia*, 544 F.2d 681 (3d Cir. 1976), *and Scott v. United States*, 136 U.S.App.D.C. 377, 419 F.2d 264 (1969), *with United States v. Vermeulen*, 436 F.2d 72, 76 (2nd Cir. 1970), *and United States v. Chaidez-Castro*, 430 F.2d 766, 770 (7th Cir. 1970), *and Gollaher v. United States*, 419 F.2d 520, 530 (9th Cir. 1970). We note, however, that many of the cases aligned on either side of the divide involved a sentencing court's attempt to bargain with the defendant, expressly conditioning a reduced sentence upon confession or cooperation. *See, e. g. United States v. Rogers, supra; United States v. Chaidez-Castro, supra.* We need not and do not reach the question of the permissibility of such open bargaining.

■ We have, however, recognized that open bargaining with the defendant may indicate that the trial court is punishing the defendant for failing to confess his misdeeds and have found such punishment grounds to vacate sentence. *See LeBlanc v. United States, supra.* Moreover, we have expressed concern in another context that a defendant's utilization of his right to appeal and retrial cannot carry the "price tag" of the risk of increased sentence based upon a reevaluation of the culpability of his acts. *Marano v. United States, supra*, 374 F.2d at 585. We perceive a distinction, however, between punishing a defendant for maintaining his innocence and preserving his right to appeal—whether that punishment be expressly or subtly imposed—and merely considering a defendant's failure to recant when evaluating his prospects for rehabilitation without incarceration. The trial court in the case at bar expressly recognized the appellant's right to remain silent and framed its remarks about appellant's failure to confess in the context of evaluating his prospects for rehabilitation. We think the consideration of defendant's attitude was permissible (*see Gollaher v. United States, supra*) and represented the sort of individual consideration we found lacking in *United States v. Wardlaw, supra.*

We recognize that it may be difficult if not impossible in some cases to distinguish between permissible evaluation of the defendant's character and impermissible punishment for failure to confess. In *United States v. Grayson*, 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978), the Supreme Court faced a similar dilemma, whether to allow a sentencing judge to consider a defendant's prevarication at trial when that consideration might disguise an impermissible punishment for the uncharged crime of perjury. The Court decided that the trial judge's need and responsi-

cial parole term of at least two years required by the applicable statute. The Court has considered the possibility of a young adult sentence under the Federal Youth Corrections Act, but in light of the magnitude of this offense, the

defendant's evident sophistication, including, if the Court has previously not mentioned, his prior criminal record, the Court does not feel he is an appropriate subject for treatment under the Act."

bility "to consider the defendant's whole person and personality" at sentencing should prevail. *Id.* We think the same consideration applies here.

Appellant's challenge to consideration of his failure to cooperate follows from and falls with the confession issue. Consideration of failure to cooperate with authorities is certainly germane to an evaluation of a defendant's attitude toward society. It is only objectionable insofar as cooperation entails admitting the crime charged. As with the confession issue, we think the sentencing court in the case at bar permissibly considered failure to cooperate as an element of character and was not punishing defendant for exercising his Fifth Amendment rights.

In addition to the general context of the allegedly objectionable statements, *i. e.,* the prospects for rehabilitation, two aspects of the trial court's statement support our conclusion that there was no impermissible encroachment upon Fifth Amendment rights here.. First, the court specifically mentioned the magnitude of the offense and the defendant's prior criminal record as influencing its decision. These considerations were first mentioned in the context of the Youth Corrections Act but in language that strongly suggests the court applied the same considerations in determining sentence as an adult. Indeed, the court thought it had already discussed the prior criminal record. Moreover, the trial court was convinced that appellant had played an important role in a massive violation of the law. A court is unquestionably free to consider the magnitude of the violation charged and the defendant's role in the violation when imposing sentence. The articulation of these additional reasons for maximum sentencing allays any fears we might have that the sentencing decision was tainted by impermissible considerations.

Finally, the trial court's discussion of appellant's failure to cooperate in bringing to justice the members of a continuing smuggling operation immediately followed the government's persuasive plea for a stiff sentence as a general deterrent to a growing problem. Although general deterrence is much criticized and cannot justify "mechanistic" imposition of stiff sentences (*see United States v. Foss, supra,* 501 F.2d at 527), general deterrence is a permissible consideration at sentencing. *Id.* We perceive such a purpose running as a strong undercurrent throughout the trial court's discourse. We cannot say that considering general deterrence in this situation was an abuse of discretion.

We reiterate in closing that we do not decide today that failure to confess and cooperate may always be permissible bases for sentencing. Rather, in light of the entire context of the sentencing statement, we find that the trial court permissibly considered such behavior as reflecting upon the likelihood of rehabilitation.

*Affirmed.*