**UNITED STATES of America,**
**Appellee,**

v.

**Samuel BERKOWITZ, Defendant,**
**Appellant.**

**No. 7587.**

United States Court of Appeals,
First Circuit.

July 10, 1970.

---

Sheldon Newman, Chelsea, Mass., with whom Leader & Newman, Chelsea, Mass., was on brief, for appellant.

James B. Krasnoo, Asst. U. S. Atty., with whom Herbert F. Travers, Jr., U. S. Atty., was on brief, for appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

McENTEE, Circuit Judge.

Appellant, the proprietor of the Apollo Shoe Store in Chelsea, Massachusetts, was indicted and convicted of possession of goods of a value in excess of $100 stolen in interstate commerce, knowing them to have been stolen.[1] He was sentenced to imprisonment for two years and fined $2,000. The goods involved were eight cartons of slippers under consignment from Phoenix Slipper Company in Secaucus, New Jersey to the W. T. Grant Store in Stoneham, Massachusetts. The carrier from which the slippers were taken was the Hemingway Trucking Company. Appellant attacks his conviction on the grounds that the eight cartons of slippers, which were admitted as evidence against him, should have been suppressed, that an invoice used to establish the value of the goods was inadmissible, and that his motions for acquittal and new trial were improperly denied.

On the morning of May 21, Henry Alfonso, Hemingway's terminal manager, notified the Federal Bureau of Investigation that he had reason to believe that a shipment of goods would be stolen. The truck carrying the slippers was placed under surveillance by two teams of FBI agents. During the surveillance, which lasted from 9:35 to 10:50 in the morning, the driver of the truck carrying the slippers was seen talking to the

---

1. "Whoever embezzles, steals, or unlawfully takes, carries away, or conceals, or by fraud or deception obtains from any pipeline system, railroad car, wagon, motortruck, or other vehicle, or from any tank or storage facility, station, station house, platform or depot or from any steamboat, vessel, or wharf, or from any aircraft, air terminal, airport, aircraft terminal or air navigation facility with intent to convert to his own use any goods or chattels moving as or which are a part of which [sic] constitute an interstate or foreign shipment of freight, or express, or other property; or

"Whoever buys or receives or has in his possession any such goods or chattels, knowing the same to have been embezzled or stolen;

\*  \*  \*  \*  \*

"Shall in each case be fined not more than $5,000 or imprisoned not more than ten years, or both; but if the amount or value of such money, baggage, goods or chattels does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both." 18 U.S.C. § 659 (Supp. V, 1970).

driver of a blue station wagon while making an unscheduled stop. At this time the station wagon was empty. For a fifteen minute period, contact was broken. When the surveillance of the station wagon was resumed the agents observed that it was loaded with cartons. They could also see the Hemingway truck further down the same street.

Agents Collins and O'Malley followed the station wagon to the Apollo Shoe Store. There they observed the driver bringing the cartons into the store. Collins and O'Malley entered the store about 10:50 a.m. without a warrant and inquired for the owner. The appellant came forward to meet them. They introduced themselves as FBI agents and Collins asked where the cartons were that had just been delivered. At the same time O'Malley noticed some cartons to the rear of the store and read the name "Phoenix Slipper Company" on at least one of them. In response to Collins' query, appellant said "over there" and pointed to where the cartons were located.

In response to questions put by the agents, appellant said that he did not know the driver of the blue station wagon but he could describe him and that he would be returning; that he hadn't paid anything for the cartons; and that if the goods were stolen, he didn't want anything to do with them. At about this time, appellant was advised that the agents were seizing the cartons and their contents and agent O'Malley instructed the appellant as to his *Miranda* rights.

At 11:15, without being asked, appellant closed his shop to the public. Between 11 and 3:30, however, he was free to move at will. He made telephone calls, went to the basement, to the bathroom, and several times left the store and returned. An employee, Bazylewicz, was also allowed to come and go during the day. At 11:40 the man who had driven the station wagon returned to the shoe store in a different vehicle, a black Chevrolet. As he approached the store agent O'Malley went to the door. The

man looked at both O'Malley and the appellant, said something like "oh, nothing today" and left. Appellant made a hand motion, waving him off, as he had done with other customers. He did not identify this man although O'Malley recognized him as the same one who had delivered the cartons.

Between 3:15 and 3:30 another FBI agent entered the store and placed appellant under arrest. Shortly before, the FBI had learned that there were more stolen cartons in the black Chevrolet. Between 3:30 and 4 the FBI removed the eight cartons from the store.

■ In denying appellant's pretrial *motion to suppress, the district court* held that the seizure of the goods did not take place until the cartons were removed and thus was incident to a lawful arrest. With this conclusion we cannot agree. When agent Collins was asked at what time he took possession of the cartons he replied, "at approximately 11 o'clock * * * we advised Mr. Berkowitz that we were seizing the cartons." The record shows that he so informed the appellant at least twice. No one was permitted to touch the cartons and an agent was posted nearby to guard them. Furthermore, the agents testified that the reason the cartons were not removed before 3:30 p.m. was that they did not have enough manpower to do so. Unmistakably, the FBI exercised complete dominion over the goods by 11 a.m. Moreover, physical removal of the cartons is not the test.

■ Although we do not agree with the reasoning employed by the district court, we reach the same result by a different route. In the first place, when the agents entered the store, the cartons they had reason to believe had been stolen were in plain view. Agent O'Malley was able to make out the words "Phoenix Slipper Company" even before appellant pointed toward the boxes. *See* United States v. Thomas, 396 F.2d 310 (2nd Cir. 1968). We think it settled that:

"mere observation [does not] constitute a 'search'. If an officer sees the

fruits of crime—or what he has good reason to believe to be the fruits of crime—lying freely exposed on a suspect's property, he is not required to look the other way, or disregard the evidence his senses bring him." Ellison v. United States, 93 U.S.App.D.C. 1, 206 F.2d 476, 478 (1953). We so held in Robbins v. MacKenzie, 364 F.2d 45, 47 (1st Cir.), cert. denied, 385 U.S. 913, 87 S.Ct. 215, 17 L.Ed.2d 140 (1966) and Fagundes v. United States, 340 F.2d 673, 676 (1st Cir. 1965).

■ Appellant contends that the agents were on his property without legal justification because their reason for being there was not related to his trade. He argues that since their entrance was a trespass *ab initio*, whatever transpired afterwards was tainted. We do not agree. A commercial establishment when open to the public is open for all legitimate purposes. It was not illegal to walk in with the intention of looking around. Such a rule in no way offends the traditional notions regarding the right of the individual to be secure against unwarranted governmental intrusion.

■ Appellant also seeks to attach legal significance to the fact that the agents were halfway into the store before they saw the cartons. But once the agents were on the premises, in a place where they had a right to be, it is immaterial where they stood as long as the cartons were not concealed from view.

The question remains whether the evidence should have been suppressed as the product of an unreasonable seizure within the contemplation of the Fourth Amendment. Appellant argues that a warrant should have been obtained before the cartons were seized. When the agents entered appellant's place of business they had no cause to believe that he was involved in the theft. Their purpose was to ascertain whether the cartons delivered to the store were the same ones that had disappeared from the Hemingway truck. Appellant denied any involvement, appeared to cooperate with the agents, offered to identify the man who delivered the shoes upon his return and testify against him in court. When told by the agents that they believed the shoes were stolen, he said, "well, I don't want any part of any hot shoes, any stolen shoes."

■ The protections guaranteed by the Fourth Amendment are not absolute; they may be waived. Bumper v. North Carolina, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); Zap v. United States, 328 U.S. 624, 628, 66 S. Ct. 1277, 90 L.Ed. 1477 (1946), vacated on other grounds, 330 U.S. 800, 67 S.Ct. 857, 91 L.Ed. 1259 (1947). Where consent is given, courts must go beyond appearances and inquire whether the consent was a "voluntary, intentional and understood waiver of a known right, or, on the contrary, was the product of deceit, duress and coercion, actual or implicit." United States v. Curiale, 414 F.2d 744, 746 (2d Cir. 1969). Each case must be viewed on its own facts and in its own context. Higgins v. United States, 93 U.S.App.D.C. 340, 209 F.2d 819, 820 (1954); United States v. Lewis, 274 F.Supp. 184, 188 (S.D.N.Y.1967). And factual distinctions such as whether the defendant was under arrest, Judd v. United States, 89 U.S.App.D.C. 64, 190 F.2d 649, 651 (1951); whether he was physically restrained, United States v. McCunn, 40 F.2d 295 (S.D.N.Y.1930); and where the seizure occurred, Trujillo v. United States, 294 F.2d 583 (10th Cir. 1961), are of great importance.

■ The facts that distinguish this case from a host of others are that the seizure of the cartons took place long before any arrest was made and at a time when the appellant gave every appearance of cooperating with the authorities. His repeated assurance that if the cartons were stolen he wanted no part of them was a clear abandonment of any claim to the goods. This being the case, no warrant was needed to validate the seizure.

■ Nor do the circumstances concerning appellant's arrest show any overreaching on the part of the authori-

ties. There is nothing to indicate that the agents coerced the appellant to allow them to remain on the premises. He volunteered the information that the person who delivered the shoes was expected to return. It was therefore reasonable for them to remain. He was not asked to close the store but did so of his own volition. Furthermore, he was allowed to move about freely and to leave the store several times. He did not ask the agents to leave the premises. By two o'clock, after he had failed to identify the man who came to the door just before noon as the man who had delivered the cartons earlier in the day, the agents certainly had probable cause to arrest him. The fact that he was not actually placed under arrest until three o'clock is immaterial barring a showing of prejudice. We are unaware of any right of a defendant to be arrested at a particular time.

█ Appellant's next contention is that because he was not given *Miranda* warnings until after his initial conversation with the agents, his statements could not be used in evidence against him. In light of the facts, our answer to this contention suggests itself. *Miranda* requires that the warnings be given when the person being interrogated is "in custody at the station or otherwise deprived of his freedom of action in any significant way." The record clearly shows that appellant's freedom of movement was not restricted prior to, or indeed, after the warnings. Nor is there any indication that he was subjected to any psychological pressure. *Miranda* does not preclude the authorities from asking routine questions in the performance of their duties.

We come now to the question of the denial of appellant's motions for judgment of acquittal and new trial. Although he maintains that the govern-ment failed to prove each and every element of the crime charged, he concentrates his attack on the element of knowledge. According to the appellant, the only evidence from which the jury could infer that he knew the slippers were stolen was the naked possession of the goods involved. This, he says, is not enough. Silverman v. United States, 2 F.2d 716 (6th Cir. 1924).

█ The court's instruction to the jury was most comprehensive on the subject of inferences. The jury was told that it was under no compulsion to draw an inference of guilty knowledge from possession but that it should consider the reasonableness of such an inference in light of all the circumstances. The circumstances which the jury could have taken into consideration were that the appellant accepted a shipment of goods plainly addressed to someone else, opened at least three of the cartons and removed slippers, failed to identify the man who delivered them after telling the FBI agents that he could do so, and waved the man off when he appeared at the door a short time thereafter. On these facts we think the jury was justified in inferring that the appellant knew the slippers had been stolen.

█ Further objection is taken to that portion of the charge which states that "[i]n the absence of a reasonable explanation of defendant's possession consistent with innocence, the jury may be warranted in finding a defendant guilty." This instruction is said to encroach upon appellant's right not to testify in his own behalf.[2]

When the charge is read in its entirety, however, it is clear that appellant's Fifth Amendment rights were not violated. The court took great pains to clarify the relationship between its instruction and the Fifth Amendment.[3]

2. Since no objection to the charge was made at trial, our only concern is whether there was plain error.

3. It stated: "The second aspect of this rule that should be clarified has to do with possession without a reasonable ex-planation, and the phrase appears again in this rule, 'in the absence of a reasonable explanation of the defendant's possession.' If you find that the goods were stolen and if you find that Mr. Berkowitz had possession, and if you consider application of this rule to the case, you must

In our opinion the jury was thoroughly apprised of the principles to be applied in ascertaining the element of knowledge. United States v. Minieri, 303 F.2d 550, 554 (2d Cir.), cert. denied, 371 U.S. 847, 83 S.Ct. 79, 9 L.Ed.2d 81 (1962).

One further evidentiary point remains to be considered. In order to invoke the harsher penalties imposed by § 659[4] it was necessary for the government to show that the value of the slippers in question exceeded $100. It sought to do this through the introduction of an invoice made by Phoenix Slipper Company, the shipper of the goods. Hemingway's terminal manager (Alfonso) testified that his company obtained the invoice from Phoenix for the purpose of determining its liability for the loss of the goods and that I.C.C. regulations required that such documents be kept in the usual and ordinary course of the carrier's business. Also, he claimed to have personal knowledge as to how Hemingway's claim department maintained its files, stated that the value appearing on the invoice was in excess of $100, but admitted he did not know whether the amount was an accurate estimation of the value of the slippers.

Since the invoice was introduced for the purpose of establishing the truth of its contents, it should have been excluded unless it fits within one of the exceptions to the hearsay rule. The narrow question before us is whether it was admissible under the Federal Business Records Act.[5] 28 U.S.C. § 1732 (1964).

The rigid common law rule regarding admissibility of records was replaced by the shop book rule on the assumption that "the character of the records and their earmarks of reliability acquired from their source and origin and the nature of their compilation" guaranteed their dependability. Palmer v. Hoffman, 318 U.S. 109, 114, 63 S.Ct. 477, 87 L.Ed. 645 (1943).

The invoice introduced here as evidence of the value of the slippers was not a record "made" by Hemingway in the regular course of its business. It was merely a copy of an invoice made by someone else, sent on request to Hemingway, and kept by it for filing. The fact that Hemingway relied on the invoice to establish the amount of the loss does not supply the critical omission of any evidence that Phoenix made and preserved the invoice in the regular course of its business. Alfonso could testify to the receipt and retention of the invoice but not to its trustworthiness as a business record made by the Phoenix Slipper Company. Standard Oil Co. v. Moore, 251 F.2d 188, 213 (9th Cir. 1957), cert. denied, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958); Ace Freight Forwarding Co. v. Balt. & O. R. R., 202 A.2d 649 (D.C.Ct.App.1964); United States v. Martin, 167 F.Supp. 301, 303 (N.D.Ill.1958); cf. United States v. Shiver, 414 F.2d 461 (5th Cir. 1969); Phillips v. United States, 356 F.

understand that that explanation does not have to come from Mr. Berkowitz's lips. That rule does not govern in any way his right not to testify or his right not to make a statement in the absence of counsel under the principles that I have referred to earlier. It means without a reasonable explanation by other facts or circumstances. * * *"

4. See n. 1, supra.

5. "(a) In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

"All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

"The term 'business,' as used in this section, includes business, profession, occupation, adn calling of every kind." 28 U.S.C. § 1732(a) (1964).

2d 297, 307 (9th Cir. 1965), cert. denied, Walker v. United States, 384 U.S. 952, 86 S.Ct. 1573, 16 L.Ed.2d 548 (1966); Hagans v. Ellerman & Bucknall S. S. Co., 318 F.2d 563, 574–576 (3d Cir. 1963); Masterson v. Pennsylvania R. R., 182 F.2d 793, 797 (3d Cir. 1950); Clainos v. United States, 82 U.S.App.D. C. 278, 163 F.2d 593, 595 (1947).

Consequently, we are satisfied that appellant was prejudiced by the admission of the invoice but only insofar as it resulted in a stiffer sentence under the statute. In our opinion the proper remedy is to remand to the district court for imposition of a lesser sentence as provided in the statute. United States v. Horning, 409 F.2d 424, 426 (4th Cir. 1969); United States v. Ciongoli, 358 F.2d 439, 441 (3d Cir. 1966); Robinson v. United States, 333 F.2d 323, 326 (8th Cir. 1964); United States v. Wilson, 284 F.2d 407 (4th Cir. 1960).

The case is remanded to the district court for proceedings consistent with this opinion.