UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1325

UNITED STATES OF AMERICA,
Appellee,

v.

SHAUN K. O'NEIL,
Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, U.S. District Judge]

Before

Selya, Circuit Judge,

Coffin, Senior Circuit Judge,

and Barbadoro,* District Judge.

William Maselli for appellant.

Michael M. DuBose, Assistant United States Attorney, with

whom Jay P. McCloskey, United States Attorney, was on brief, for

appellee.

December 15, 1993

*Of the District of New Hampshire, sitting by designation.

SELYA, Circuit Judge. Concluding, as we do, that
SELYA, Circuit Judge.

several courts of appeals have read the supervised release

revocation provision (SRR provision), 18 U.S.C. 3583(e)(3)

(1988 & Supp. III 1991), in too crabbed a manner, we hold today

that this statute permits a district court, in resentencing a

person who has violated the conditions of his or her original

term of supervised release, to impose a new term of supervised

release in conjunction with an additional prison term, subject to

certain restrictions limned in the statute itself. Because we

are staking out a position at variance with the majority view, we

write at some length to explain our rationale.

I. BACKGROUND OF THE CASE

After having broken into a post office and stolen mail

in violation of 18 U.S.C. 1708, 2115 (1988), defendant-

appellant Shaun K. O'Neil pleaded guilty to a class D felony. On

November 9, 1990, the district court sentenced him to serve

twenty-one months in prison (the top of the applicable guideline

sentencing range), followed by three years of supervised release

(the maximum allowed by statute). We affirmed the sentence. See

United States v. O'Neil, 936 F.2d 599 (1st Cir. 1991).

Soon after his release from the penitentiary, appellant

committed several significant violations of the supervised

release conditions, e.g., stealing a firearm while intoxicated.

Dubbing appellant a "walking juvenile crime wave" who posed "a

serious danger to the public," the district judge revoked the

original term of supervised release and sentenced appellant to an

2

additional twenty-four months in prison, to be followed by a new

three-year supervised release term. O'Neil appeals, asking that

we vacate his sentence and remand for resentencing. His

principal allegation is that the reimposition of supervised

release exceeds the district court's statutory authority.

II. THE STATUTE

Passed as part of the Sentencing Reform Act of 1984, 18

U.S.C. 3551-3559, 3561-3566, 3571-3574, 3581-3586, & 28 U.S.C.

991-98 (1988 & Supps.), the supervised release alteration

statute, 18 U.S.C. 3583(e), of which the SRR provision is a

part, authorizes a court to alter a term of supervised release in

a number of ways. A court may:

(1) terminate a term of supervised release
and discharge the person released at any time
after the expiration of one year of
supervised release . . . ;

(2) extend a term of supervised release if
less than the maximum authorized term was
previously imposed, and may modify, reduce,
or enlarge the conditions of supervised
release, at any time prior to the expiration
or termination of the term of supervised
release . . . ;

(3) revoke a term of supervised release, and

require the person to serve in prison all or

part of the term of supervised release

without credit for time previously served on
postrelease supervision, if it finds by a
preponderance of the evidence that the person
violated a condition of supervised release,
pursuant to the provisions of the Federal
Rules of Criminal Procedure that are
applicable to probation revocation and to the
provisions of applicable policy statements
issued by the Sentencing Commission, except
that a person whose term is revoked under
this paragraph may not be required to serve
more that 3 years in prison if the offense

3

for which the person was convicted was a
Class B felony, or more than 2 years in
prison if the offense was a Class C or D
felony; or

(4) order the person to remain at his place
of residence during nonworking hours . . . .

18 U.S.C. 3583(e) (emphasis supplied). The present controversy

centers on the third of these four options.

The alteration statute empowers a resentencing court,

in certain circumstances, to elongate a previously imposed term

of supervised release, 18 U.S.C. 3583(e)(2), or, in other

circumstances, to revoke supervision and impose imprisonment in

lieu of supervision, id. at 3583(e)(3). What is unclear, and

what has confounded the courts, is whether an intermediate

resentencing option exists: Does the statute allow a court to

revoke supervision and, in effect, restructure the defendant's

sentence by imposing a combination of imprisonment plus further

supervision?

Although this court has never addressed the question, a

minimum of six circuits have read the statute to foreclose the

reimposition of a term of supervised release following revocation

and imprisonment. See United States v. Truss, 4 F.3d 437, 438

(6th Cir. 1993); United States v. McGee, 981 F.2d 271, 274-76

(7th Cir. 1992); United States v. Koehler, 973 F.2d 132, 134-36

(2d Cir. 1992); United States v. Cooper, 962 F.2d 339, 340-42

(4th Cir. 1992); United States v. Holmes, 954 F.2d 270, 271-73

(5th Cir. 1992); United States v. Behnezhad, 907 F.2d 896, 898-99

(9th Cir. 1990); see also United States v. Gozlon-Peretz, 894

4

F.2d 1402, 1405 n.5 (dictum), amended, 910 F.2d 1152 (3d Cir.

1990), aff'd on other grounds, 498 U.S. 395 (1991). The Tenth

Circuit came to the same conclusion belatedly, after reversing

its field. See United States v. Rockwell, 984 F.2d 1112, 1117

(10th Cir.) (overruling United States v. Boling, 947 F.2d 1461

(10th Cir. 1991)), cert. denied, 113 S. Ct. 2945 (1993). The

Eleventh Circuit has sent mixed signals. In United States v.

Tatum, 998 F.2d 893, 894-95 (11th Cir. 1993) (per curiam), the

court embraced the majority view. A second panel, two weeks

later, bowed to Tatum on stare decisis grounds; but, in a sharp

departure from customary practice, all three judges expressed

their profound disagreement with Tatum's holding. See United

States v. Williams, 2 F.3d 363, 365 (11th Cir. 1993). Thus, nine

circuits in all read the SRR provision narrowly. On the other

side of the ledger, the Eighth Circuit stands as a waif in the

wilderness. See United States v. Schrader, 973 F.2d 623, 624-25

(8th Cir. 1992) (holding that section 3583(e)(3) permits the

reimposition of a term of supervised release following revocation

and imprisonment); see also United States v. Levi, 2 F.3d 842,

846 (8th Cir. 1993) (reaffirming Schrader).

We are called upon today to add our voice to the

chorus. We approach this task mindful that, while the decision

to revoke a term of supervised release is ordinarily reviewable

for abuse of discretion, the quintessentially legal question of

whether a post-revocation sentence exceeds statutory limits

necessitates plenary review . See Rockwell, 984 F.2d at 1114;

5

see also United States v. St. Cyr, 977 F.2d 698, 701 (1st Cir.

1992) (holding that interpretive questions under the sentencing

guidelines should be reviewed de novo).

III. THE COMPETING INTERPRETATIONS

We start our quest by elucidating the two ways in which

the SRR provision may be read as a coherent command.

A
A

To achieve the result reached by the majority of

courts, the assiduous reader must proceed along the following

lines. First, read the word "revoke" restrictively, i.e., in the

sense of "cancel" or "annul," so that it does not allow either

the recommencing of the previously imposed term of supervision or

the commencement of a new term of supervision. Next, suppose

that the word "term", when used for the second time in the SRR

provision, does not imply that there is a term of supervision in

existence, but merely serves to set a temporal limit on the

prison sentence that may be imposed following revocation; or, put

another way, that the second use of the word "term" is to be read

as if it were shorthand for a more verbose phrase like "the time

period equivalent to what would have been the term." Only if

these interpretive steps are taken does it become clear, under

the SRR provision, that a court may absolutely extinguish a term

of supervised release and impose a new prison term, subject to

certain statutory limitations,1 but, withal, may not impose any

1On the majority's reading, the statutory limit in a given
case is the lesser of (i) the length of the original term of
supervision, or (ii) the numerical limit designated by the final

6

other or further supervision term.

B

The other possible parsing of the SRR provision

proceeds in three phases. At the outset, consider the

possibility that the word "revoke" means simply to "recall."

See, e.g., Black's Law Dictionary 1322 (6th ed. 1990) (defining

"revoke" as "[t]o annul or make void by recalling or taking back

. . . ."). If "revoke" is read in this way, the SRR provision is

not inconsistent with the recommencement of supervised release.

Next, from the fact that the SRR provision mentions a "term of

supervised release" in that portion of the text following the

conferral of the power to revoke, the reader plausibly can infer

that the supervision term recommenced upon revocation else

there would be no term then in existence. Finally, having

posited that the supervision term is alive and well,

notwithstanding the court's order of revocation, the reader can

conclude that, in authorizing the court to send a person to

prison after revocation for "all or part of the term," the SRR

provision contemplates that any remaining part of the original,

recalled term will be devoted to supervision. On this reading,

the SRR provision allows a court to call back a term of

supervised release, recommence the term, convert all or part of

clause of the SRR provision vis-a-vis each specified class of
offense.

7

it into jail time (up to the statutory limit),2 and retain any

remainder as a period of non-detentive monitoring.

Before leaving these competing versions, we wish to

make two preliminary points. First, we do not regard the initial

step in these analyses to be indispensable. See infra Part

IV(A). Second, each of the competing versions requires the

reader to make a leap of faith beyond the four corners of the SRR

provision itself. In this sense, then, the playing field is

level.

IV. CHOOSING AN INTERPRETATION

We turn to the difficult choice between these meanings,

using the full panoply of available aids to the construction of

legislative enactments.

A

In approaching statutory interpretation, "it is

axiomatic that the plain words and structure of the statute must

be paramount." United States v. Aversa, 984 F.2d 493, 498 (1st

2On this reading of the SRR provision, there are two
operative limits in any given case. First, the combined length
of all post-revocation impositions (incarcerative and
supervisory) may not exceed the length of the original term of
supervision. Second, the incarcerative portion of the post-
revocation sentence may not exceed the numerical limit designated
by the SRR provision's final clause for the class of offense in
question. It will be noted that, on this reading, the concluding
clause of the SRR provision places an absolute ceiling on the
time a person may serve in prison following revocation of a term
of supervised release and thereby ensures that the criminal
justice system cannot trap an offender in its web forever. This
point adequately answers those who assert that construing the SRR
provision broadly sets the stage for a never-ending cycle of
revocation, resentencing to prison plus supervision, and
revocation again, see McGee, 981 F.2d at 275.

8

Cir. 1993) (en banc). Most of the courts that have read section

3583(e) to foreclose the imposition of a post-revocation term of

supervised release have done so under the banner of plain

meaning. Those courts read the word "revoke" as signifying an

extinguishment so uncompromising as to preclude a post-revocation

term of supervision. See, e.g., McGee, 981 F.2d at 274; Koehler,

973 F.2d at 134-35; Holmes, 954 F.2d at 272. This inflexible

insistence upon a particular version of lexicographic orthodoxy

seemingly overlooks that "the plain-meaning doctrine is not a

pedagogical absolute." Greenwood Trust Co. v. Massachusetts, 971

F.2d 818, 825 (1st Cir. 1992), cert. denied, 113 S. Ct. 974

(1993). In particular, "[t]erms in an act whose meaning may

appear plain outside the scheme of the statute can take on a

different meaning when read in their proper context." Id.

(citing various Supreme Court precedents).

The Williams court found "revoke" plain enough, but

read it differently. It suggested that "revoke" could be read in

the alternative sense of "call back." Williams, 2 F.3d at 365.

This sense is best illustrated by the poet William Cowper, who

wrote:

How readily we wish time spent revok'd,

That we might try the ground again. . . .

The Task, Book VI, l.25 (1784); see also supra p. 7 (quoting

Black's Law Dictionary). While we regard this approach as

plausible, we do not see why even the most inelastic

interpretation of "revoke" would frustrate a reading of the SRR

9

provision that permits imposition of a post-revocation term of

supervision. If a term has been called back, it may be

reimposed. If a term has been absolutely terminated, a new term

still may be imposed in the same way that, once a license is

revoked, a new one may be issued. In the end, the semantic

debate over the word "revoke" turns out to be no more than the

swapping of heuristics. No matter how the word is defined, the

language of the SRR provision is consistent with the possibility

that a post-revocation term of supervision lawfully may be

imposed.

We believe this linguistic intuition is verified by

historical precedents. Previous Congresses used the word

"revoke" in crafting the statutory forerunners of section

3583(e)(3). See, e.g., 18 U.S.C. 4214 (1988) (repealed 1984

anent offenses committed after November 1, 1987) (revocation of

parole); 21 U.S.C.A. 841(c) (1981 & Supp. 1993) (repealed 1984)

(revocation of special parole); 18 U.S.C. 3653 (1988) (repealed

1984 anent offenses committed after November 1, 1987) (revocation

of probation). Notwithstanding Congress's use of the word

"revoke," it was widely thought that reimposition of a period of

non-detentive monitoring, to commence following post-revocation

imprisonment, was permitted under all three of these antecedent

statutory provisions. See infra Part IV(D).

B

Our structural analysis of the alteration statute and,

particularly, of the SRR provision starts with the recognition

10

that the first appellate court to interpret section 3583(e)

rested its holding on the notion that the alteration statute is

structured as a set of discrete options separated by the word

"or." Given the shape of the statute, the court reasoned, a

judge may either "extend" the term under subsection (e)(2) or

"revoke" it under subsection (e)(3), but not both. See

Behnezhad, 907 F.2d at 898-99. Subsequent courts quickly moved

beyond this restrictive rationale, realizing that it collapses

into the debate over the meaning of the SRR provision and,

therefore, proves nothing. See, e.g., McGee, 981 F.2d at 274;

Holmes, 954 F.2d at 272.

To the extent that the repeated use of the disjunctive

in section 3583(e) sheds any light on Congress's intent, we

believe that it favors a broad reading of the SRR provision. The

first principal option that the alteration statute presents to a

district judge is to "terminate" the supervised release term

previously imposed under subsection (e)(1). If Congress meant to

"revoke" supervised release in the hard sense of the word, it

could simply have used the same language twice. Most likely,

then, to "revoke" as used in the SRR provision means something

other than to "terminate".

C

Two general principles of statutory interpretation

inform our conclusion that the SRR provision cannot be read

grudgingly: the principle that the grant of a greater power

necessarily includes the grant of a lesser power, unless the

11

authority to exercise a lesser power is expressly reserved; and

the principle that statutes should not be read to produce

illogical results.

1. The Greater Includes the Lesser. The principle
1. The Greater Includes the Lesser.

that the grant of a greater power includes the grant of a lesser

power is a bit of common sense that has been recognized in

virtually every legal code from time immemorial. It has found

modern expression primarily in the realm of constitutional law.

See, e.g., City of Lakewood v. Plain Dealer Publishing Co., 486

U.S. 750, 763 (1988) (commenting that the power to prohibit

speech entirely includes the lesser power to license it at the

government's discretion); Posadas de Puerto Rico Assocs. v.

Tourism Co., 478 U.S. 328, 345 (1986) (holding that the power to

ban casino gambling includes the lesser power to prohibit

advertising of casino gambling).

While this principle has nested less frequently in the

criminal law context, it is fully applicable in that milieu. To

illustrate, we use an example that bears a strong family

resemblance to the problem at hand. The federal sentencing

guidelines originally stated that "an extraordinary physical

impairment may be a reason to impose a sentence other than

imprisonment." U.S.S.G. 5H1.4, p.s. (Nov. 1990). Three courts

of appeals, including this one, refused to understand this

provision to require an all-or-nothing choice between imposing an

incarcerative sentence within the guideline range or imposing no

prison sentence. The courts reasoned that, despite the

12

unvarnished language of the provision, the greater departure (no

incarceration) necessarily included the lesser departure (a

prison sentence below the bottom of the guideline sentencing

range). See United States v. Slater, 971 F.2d 626, 635 (7th Cir.

1992); United States v. Hilton, 946 F.2d 955, 958 (1st Cir.

1991); United States v. Ghannam, 899 F.2d 327, 329 (4th Cir.

1990).3

Similarly, in this case, we are reluctant to posit an

all-or-nothing choice between continuing a defendant on

supervised release (with no further incarceration) and

imprisoning the defendant (with no further supervision). We

agree with the Eighth Circuit that if the SRR provision gives a

district court the power to sentence an offender to a full term

of imprisonment upon revocation, it must necessarily confer upon

the court "the power under that subsection to impose a less

drastic sanction." Schrader, 973 F.2d at 625.

2. Avoiding Illogical Results. It is also an
2. Avoiding Illogical Results.

established canon of statutory construction that a legislature's

words should never be given a meaning that produces a stunningly

counterintuitive result at least if those words, read without

undue straining, will bear another, less jarring meaning. See

Kelly v. United States, 924 F.2d 355, 361 (1st Cir. 1991); United

States v. Meyer, 808 F.2d 912, 919 (1st Cir. 1987); Sutherland

3This intuition was vindicated by Congress and the
Sentencing Commission when, effective November 1, 1991, the
phrase "other than imprisonment" was changed to read "below the
applicable guideline range." See U.S.S.G. App. C, Amend. 386

(Nov. 1991).

13

Stat. Const. 45.12 (5th ed.). This principle goes back to the

early days of the Republic. See M'Culloch v. Maryland, 17 U.S.

(4 Wheat.) 316, 355 (1819).

In this case, the sentencing rule that emerges from a

narrow reading of section 3583(e)(3) is surpassingly difficult to

defend from a policy perspective. It is hard to conceive any

logical reason why Congress might authorize sentencing an

offender to a non-mandatory term of imprisonment, variable in the

judge's discretion, upon revocation of a term of supervised

release, but would, at the same time, withhold authority to

impose a sentence of equivalent duration upon more lenient

conditions. See Williams, 2 F.3d at 365; Schrader, 973 F.2d at

625. Although we could jury-rig a legislative justification for

so cramped an interpretation of the law, we think it is self-

evident that barring judges from reimposing supervision following

revocation needlessly inhibits the court's sentencing options

while at the same time failing to advance any of the fundamental

goals of criminal sentencing.4 As a matter of policy, then, the

implications for sentencing inherent in a stingy reading of the

SRR provision go a long way toward convincing us that Congress

could not have favored (or intended to compel) such a reading.

D

As a rule, courts should resort to legislative history

4The fundamental goals of the Sentencing Reform Act are
commonly thought to include uniformity, honesty, and
proportionality. See United States v. Williams, 891 F.2d 962,

963-64 (1st Cir. 1989); see also U.S.S.G. Ch.1, Pt.A, intro.

comment., at 1A2 (Nov. 1992).

14

and other guides to congressional intent when the words of a

statute give rise to ambiguity or when they lead to an

unreasonable interpretation. See, e.g., United States v. Charles

George Trucking Co., 823 F.2d 685, 688 (1st Cir. 1987); Barry v.

St. Paul Fire & Marine Ins. Co., 555 F.2d 3, 7 (1st Cir. 1977),

aff'd, 438 U.S. 531 (1978). Though we believe that a generous

reading of section 3583(e)(3) best comports with plain language,

statutory structure, logic, and sound policy, we are aware that

ambiguity is commonly thought to exist when statutory language is

susceptible to differing, but nonetheless plausible,

constructions. See United States v. R.L.C., 112 S. Ct. 1329, 1334

(1992); cf. Allen v. Adage, Inc., 967 F.2d 695, 700 (1st Cir.

1992) (explaining when ambiguity exists in the text of a

contract). Here, as the weight of authority unquestionably

attests, there is room for disagreement over the meaning of the

SRR provision. Therefore, we continue our inquiry.

Where ambiguity lurks, the burial ground in which

superseded statutes rest sometimes proves a fertile field for

assistance in determining the meaning of existing statutes. See

Dwight v. Merritt, 140 U.S. 213, 217 (1891); see also Sutherland

Stat. Const. 51.04. We think that superseded statutes are of

particular value in construing provisions within the Sentencing

Reform Act. We have recognized and we believe the Sentencing

Commission has recognized the desirability of emulating pre-

guidelines practice to the extent that plain meaning does not

compel change. Thus, we have repeatedly referred to pre-

15

guidelines precedent as an aid to interpreting the sentencing

guidelines. See, e.g., United States v. Emery, 991 F.2d 907, 911

(1st Cir. 1993); United States v. Blanco, 888 F.2d 907, 910 (1st

Cir. 1989); see also U.S.S.G. 1A3, (Nov. 1992) (stating policy

that "the guidelines represent an approach that begins with, and

builds upon," pre-guidelines practice). We believe the same

principle applies in construing the Sentencing Reform Act itself.

To place the genealogy of supervised release in

historical context, one must first recognize that non-detentive

monitoring developed along two separate lines: probation and

parole. The Sentencing Reform Act, and the guidelines

implementing it, swept aside both of these modalities, replacing

probation with an entirely new creature bearing the same name and

replacing parole (as well as its interim variant, special parole)

with supervised release. See Gozlon-Peretz v. United States, 498

U.S. 395, 400 (1991) (noting that Congress intended to replace

most forms of parole, including special parole, with supervised

release).5 We think it is of critical importance that, prior to

5The transition from special parole to supervised release
was grotesquely complicated. Most existing provisions for non-
detentive monitoring were repealed in 1984 as part of the
Sentencing Reform Act, but the repeal did not take effect until
November 1, 1987. However, the special parole provision, 21
U.S.C. 841(b)(1)(A), was repealed outright. Thus, from October
12, 1984 through October 27, 1986, neither special parole nor any
substitute for it was in force. Apparently desiring to eliminate
this hiatus, Congress amended the law to insert supervised
release in lieu of special parole for the interval from October
27, 1986 to November 1, 1987. Congress accomplished this feat by
amending 21 U.S.C. 841(b) (under which no provision is made for
revocation). Subsequent to November 1, 1987, supervised release
has been controlled by the provisions of the Sentencing Reform
Act. See generally Gozlon-Peretz, 498 U.S. at 844-46

16

the sea change instigated by the Sentencing Reform Act, it was

widely understood that any of the existing forms of non-detentive

monitoring could follow a post-revocation sentence of

imprisonment. We survey the field.

1. Probation. The debate in which we are embroiled
1. Probation.

today closely tracks an earlier debate over post-revocation

probation. The relevant pre-guidelines statute empowered a court

to "revoke probation, and impose any sentence which might

originally have been imposed." 18 U.S.C. 3653 (repealed).6

Under this law, five circuits viewed probation as a kind of

"sentence" that could be imposed after revocation of probation.

See Banks v. United States, 614 F.2d 95, 99 n.10 (6th Cir. 1980);

United States v. Rodgers, 588 F.2d 651, 654 (8th Cir. 1978);

Nicholas v. United States, 527 F.2d 1160, 1162 (9th Cir. 1976);

United States v. Lancer, 508 F.2d 719, 730-32 (3d Cir.) (en

banc), cert. denied, 421 U.S. 989 (1975); Smith v. United States,

505 F.2d 893, 895 (5th Cir. 1974). The Tenth Circuit and a

district court in the Fourth Circuit took the opposite view. See

United States v. Martin, 786 F.2d 974, 976 (10th Cir. 1986)

(declining to overrule Fox v. United States, 354 F.2d 752 (10th

Cir. 1965)); United States v. Buchanan, 340 F. Supp. 1285, 1288-

(explicating historical development).

6We consider it significant that no court, on either side of
this debate, suggested that the statute's use of the word
"revoke" might require a ban on the reimposition of a non-
detentive term in sentencing defendants who had violated
probation. Instead, the debate hinged on the word "sentence"
specifically, on whether probation could be conceived as a kind
of "sentence."

17

89 (E.D.N.C. 1972). When the smoke cleared, "the weight of

authority heavily favor[ed] the conclusion that reimposition of

probation is permissible upon revocation of probation." United

States v. Urdaneta, 771 F. Supp. 28, 32 (E.D.N.Y. 1991)

(canvassing pre-guidelines case law).

Under the new sentencing regime, the statute treating

with post-revocation probation deals much more directly with the

vexed question of reimposition. It empowers a court to "revoke

the sentence of probation and impose any other sentence that was

available at the time of the initial sentencing." 18 U.S.C.

3565(a) (1988) (emphasis supplied). Although the question is not

before us, and we, accordingly, do not rule definitively on it,

it seems probable that Congress intended to depart from

prevailing pre-guidelines practice and forbid reimposition of

probation following the revocation of a term of probation.7 We

draw this inference from the insertion of the word "other," on

the theory that a change in statutory language should be "read,

if possible, to have some effect." American Nat'l Red Cross v.

S.G., 112 S. Ct. 2465, 2475 (1992). It thus appears quite likely

that the drafters of section 3565 were aware of the pre-

guidelines case law and knew how to design a statute in such a

7Even if Congress intended to preclude reimposition of
probation following revocation of a term of probation, that
intention has no implications for supervised release. Under the
Sentencing Reform Act, a term of probation may not be imposed
when a defendant is sentenced to imprisonment. See 18 U.S.C.

3553(a)(3). Since a "combined" sentence is prohibited ab initio,

it would make little sense to allow a combined form of sentencing
upon revocation of probation.

18

way as to address its impact head-on.

2. Parole. There was never any question that non-
2. Parole.

detentive monitoring could follow a prison sentence imposed in

consequence of the revocation of a term of parole or special

parole. See, e.g., 28 C.F.R. 2.52 app. (1993) (setting out

United States Parole Commission's policy statement to the effect

that "an adequate period of renewed supervision following release

from reimprisonment or reinstatement to supervision, must be

available"); id. at 2.57 (making the policy statement

applicable to special parole); see also Bentsen v. Ralston, 658

F.2d 639, 640 (8th Cir. 1981) (citing cases for the proposition

that an erstwhile parolee serving post-revocation prison time may

earn good-time credit applicable to a second parole period). In

this context, the Senate report that accompanied the Sentencing

Reform Act demonstrates Congress's awareness of the pre-

guidelines practice:

Under [pre-guidelines] law, if a parolee
violates a condition of parole that results
in a determination to revoke parole, the
revocation has the effect of requiring the
parolee to serve the remainder of his
original term of imprisonment, subject to

periodic consideration for re-release as

required for any prisoner who is eligible for
parole.

S. Rep. No. 225, 98th Cong. 2d Sess., reprinted in 1984

U.S.C.C.A.N. 3182, 3306 (emphasis supplied).

We find this historical phenomenon to be especially

significant in light of the wording of the provision pertaining

to the revocation of special parole. The governing statute

19

decreed that "[a] person whose special parole term has been

revoked may be required to serve all or part of the remainder of

the new term of imprisonment." 21 U.S.C.A. 841(c) (repealed).

Notwithstanding that in section 841(c), as in section 3583(e)(3),

there was no explicit authorization to commence a second non-

detentive term, the Parole Commission, whose interpretation of a

provision it is charged to execute is entitled to considerable

weight, see Chevron U.S.A., Inc. v. Natural Resources Defense

Council, Inc., 467 U.S. 837, 844-45 (1984), explicitly endorsed

the reimposition of special parole.

Given the obvious similarities in language, structure,

and substance between section 841(c) and section 3583(e)(3), we

are fortified in our conclusion that section 3583(e)(3) plausibly

may bear a broader interpretation than it heretofore has

received. Moreover, it seems highly likely that Congress, in

replacing a repealed provision with a new provision of hauntingly

similar wording, intended that the pre-guidelines interpretation

would continue to apply. Otherwise, Congress would almost

certainly have altered the language to clarify its intent as it

did in connection with probation, see supra Part IV(D)(1).

For these reasons, the historical development of non-

detentive monitoring, in all its permutations, reinforces our

intuition that Congress meant to leave undisturbed the widely

accepted pre-guidelines practice of allowing district courts

discretion to order a period of non-detentive monitoring as a

part of the sentence imposed for violation of supervised release

20

conditions.

E

Studying what has transpired in Congress subsequent to

the passage of the alteration statute produces another possible

aid to statutory construction. The focus here is on a bipartisan

quartet comprising four senior members of the Senate Judiciary

Committee thought to have been supremely influential in the

passage of the Sentencing Reform Act: Senators Thurmond,

Kennedy, Biden, and Hatch. These senators uniformly favor a

clarifying amendment that would remove any doubt that section

3583(e)(3) allows reimposition of supervised release. See, e.g.,

137 Cong. Rec. S10021 (daily ed. July 15, 1991) (text of S.188,

sponsored by Sens. Kennedy, Thurmond, and Biden); 139 Cong. Rec.

S2090 (daily ed. February 25, 1993) (S.468, sponsored by Sen.

Thurmond, referred to Judiciary Committee); 139 Cong. Rec. S3054

(daily ed. March 17, 1993) (Sen. Hatch added as cosponsor to

S.468).8

We understand that such thirteenth-hour pronouncements

are of uncertain value. Though courts may accord some weight to

a subsequent enactment that reflects directly on a statute under

scrutiny, see, e.g., Red Lion Broadcasting Co. v. FCC, 395 U.S.

367, 380-81 (1969), pronouncements made in the legislative

history of that subsequent statute frequently are viewed as

8For what, if any, relevance it may have, the Sentencing
Commission also favors a clarifying amendment. See U.S.S.G.

7B1.3(g)(2) (Nov. 1992) (policy statement reading statute to
allow reimposition of supervision); id. at 7B1.3, comment. (n.3)

(advocating passage of clarifying amendment).

21

unreliable, see Consumer Prod. Safety Comm'n v. GTE Sylvania,

Inc., 447 U.S. 102, 118 n.13 (1979), and pronouncements regarding

an unpassed bill may be even more problematic, see Chapman v.

United States, 111 S. Ct. 1919, 1927 n.4 (1991). Accordingly, we

reach our decision today without placing significant weight on

post-enactment materials.

Nonetheless, courts, including the Supreme Court and

this court, have occasionally thought post-enactment declarations

of congressional intent possessed some probative value. See,

e.g., Seatrain Shipbuilding Corp. v. Shell Oil Co., 444 U.S. 572,

596 (1980), (relying in part on committee report relative to

subsequently enacted amendment); United States v. Ven-Fuel, Inc.,

758 F.2d 741, 758-59 (1st Cir. 1985) (same). We believe that if

post-enactment history, short of the actual passage of a new

bill, is ever to be given weight, this case is a nearly ideal

candidate. The sponsors of the proposed amendments include the

same senators who sponsored the enacted statute;9 the emendatory

legislation has been characterized by a sponsor as "clarif[ying]"

in nature, rather than as revisory or augmentative, see 139 Cong.

Rec. S2151 (daily ed. Feb. 25, 1993) (statement of Sen. Thurmond

on S.468); 137 Cong. Rec. S8892 (daily ed. June 27, 1991)

(statement of Sen. Thurmond on S.188); and, in various

9Senators Thurmond and Biden introduced the omnibus crime
bill containing the provisions that became the Sentencing Reform
Act. Senator Kennedy submitted a freestanding sentencing bill,
containing nearly identical provisions, at approximately the same
time. See Kate Stith & Steve Y. Koh, The Politics of Sentencing

Reform: The Legislative History of the Federal Sentencing

Guidelines, 28 Wake Forest L.Rev. 223, 261 (1993).

22

incarnations, the clarification has been adopted twice by the

House and four times by the Senate (including twice by the Senate

in the form of a freestanding bill). See 139 Cong. Rec. at S2150

(citing bills). This history strongly suggests that the

amendment remains unpassed only because the vagaries of the

parliamentary process are what they are. When, as now, the two

houses of Congress, in the wake of a series of judicial decisions

going mainly in one direction, have repeatedly signified that an

amendment is needed to clarify recently enacted legislation, it

seems reasonable to infer that the courts have failed to grasp

the enacting Congress's intent. In such circumstances, the case

for giving some modest weight to post-enactment history peaks.

F

At this point, we have marshalled the available

data.10 We have found neither of the contending readings to be

obviously correct on the statute's face, and we have deterrated

no direct evidence of congressional intent sufficient to capture

the flag. In the end, however, three considerations persuade us

that a broader interpretation of the SRR provision is more likely

10In the process, we have considered and rejected the
notion that the rule of lenity, a background principle that
properly comes into play when, at the end of a thorough inquiry,
the meaning of a criminal statute remains obscure, see Chapman,

111 S. Ct. at 1926, might be of help here in discerning
congressional intent. See, e.g., Koehler, 923 F.2d at 135

(arguing that the rule of lenity cuts in favor of a narrow
construction of the SRR provision). The problem lies in
determining whose ox may be gored. Depending on the facts of any
particular defendant's situation, a generous reading of the SRR
provision can produce either a harsher or a more lenient result
than a cramped reading will produce. Thus, we regard the
interpretive struggle over the SRR provision as lenity-neutral.

23

what Congress intended. First, a narrow rendering is

inharmonious with the statute as a whole. Second, in choosing

between two plausible readings, we hesitate to select the

alternative that in effect imputes to Congress a policy for which

no compelling rationale can be postulated (and that, in the

bargain, blindly treats a greater power as if it did not include

a lesser power). Third, given a statute of protracted

indeterminacy, we are inclined to favor the interpretation that

promotes continuity with traditional sentencing practice all

the more so since the preexisting practice was based in

significant part upon a similarly worded statute. For these

reasons, and despite our abiding respect for the courts that have

gone the other way, we hold that the district judge did not err

in concluding that he possessed the power to impose both a prison

term and a term of supervised release following revocation of

appellant's original supervision term.

V. APPLYING THE SRR PROVISION

Having determined that the court below correctly

grasped the essential meaning of the SRR provision, we find,

nonetheless, that it erred in fashioning appellant's sentence.

In this case, upon revocation of the original term of supervised

release, the SRR provision yields a maximum sentence length of

three years. See 18 U.S.C. 3583(e)(3). No more than two years

24

of that period can be devoted to incarceration.11 See id. The

key to these computations is that the combined limit of three

years matches the length of the original term of supervision and

the secondary limitation two years in prison matches the

statutory maximum allowable for revocation of supervised release

when the underlying offense is a Class D felony. See id. In

light of these benchmarks, it is apparent that the sentence

imposed here exceeded the maximum sentence authorized by law.

Specifically, upon revocation of supervised release, the

imposition of a two-year prison term followed by a fresh three-

year supervision term is unlawful.

Although O'Neil's sentence must be vacated, at least in

part, the contours of the appropriate remedy remain tenebrous.

On one hand, the government tells us that we should in effect lop

11We are aware that the Sentencing Commission's policy
statement contemplates that the new term of imprisonment will be
"less than" the maximum term of imprisonment imposable upon
revocation for each class of offense, U.S.S.G. 7B1.3(g)(2) p.s.,
but we use round numbers for simplicity's sake. Moreover,
although a policy statement ordinarily "is an authoritative guide
to the meaning of the applicable guideline," Williams v. United

States, 112 S. Ct. 1112, 1119 (1992), the policy statements of

Chapter 7 are unaccompanied by guidelines, and are prefaced by a
special discussion making manifest their tentative nature, see

U.S.S.G. Ch.7, Pt.A, intro. comment. Hence, we today join six
other circuits in recognizing Chapter 7 policy statements as
advisory rather than mandatory. See United States v. Thompson,

976 F.2d 1380, 1381 (11th Cir. 1992); United States v. Bermudez,

974 F.2d 12, 14 (2d Cir. 1992); United States v. Cohen, 965 F.2d

58, 59-61 (6th Cir. 1992); United States v. Lee, 957 F.2d 770,

773 (10th Cir. 1992); United States v. Blackston, 940 F.2d 877,

893 (3d Cir.), cert. denied, 112 S. Ct. 611 (1991); United States

v. Oliver, 931 F.2d 463, 465 (8th Cir. 1991). On remand, the

lower court must consider, but need not necessarily follow, the
Sentencing Commission's recommendations regarding post-revocation
sentencing.

25

off the last two years of the supervision term, thus bringing the

sentence into statutory alignment. On the other hand, appellant

urges us to vacate the whole sentence and remand for

resentencing, thus permitting the district court, armed with our

insights into the workings of the SRR provision, to rethink its

options. While there is precedent for each of these

alternatives, compare, e.g., United States v. Vasquez, 504 F.2d

555, 556 (5th Cir. 1974) (per curiam) (holding that the excessive

portion of a sentence may be trimmed and the remainder left

intact) with, e.g., United States v. Berkowitz, 429 F.2d 921, 928

(1st Cir. 1970) (vacating entire sentence and remanding for

resentencing), we believe that the latter option is preferable in

this case. We explain briefly.

Although subject to constitutional constraints,

statutory limitations, and, now, the guidelines, sentencing is,

by and large, within the province of the district court.

Sentences usually contain a variety of components, e.g., an

incarcerative component, a monetary component (say, a fine or

cost-of-confinement order), and a non-detentive, non-monetary

component (say, supervised release). These components often

interrelate. Where an appellate court unties the bundle and

decides that one component must be reconfigured, it may often be

better practice to enlist the district court to retrofit the

package. So it is here. We think that the district court, not

this court, is best equipped to gauge what the overall sentence

should be. See generally United States v. Pimienta-Redondo, 874

26

F.2d 9, 14 (1st Cir.) (en banc) (discussing resentencing in

multiple-count case after determination that the Double Jeopardy

Clause barred imposition of separate sentence on one of two

counts of conviction), cert. denied, 439 U.S. 890 (1989).

VI CONCLUSION

We need go no further. We hold that the SRR provision,

18 U.S.C. 3583(e)(3), permits a district court, upon revocation

of a term of supervised release, to impose a prison sentence or a

sentence combining incarceration with a further term of

supervised release, so long as (1) the incarcerative portion of

the sentence does not exceed the time limit specified in the SRR

provision itself, and (2) the combined length of the new prison

sentence cum supervision term does not exceed the duration of the

original term of supervised release. Since the district court

overstepped these boundaries, we vacate appellant's sentence and

remand for resentencing.

It is so ordered.

27